**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NANOMECH, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No.__ _____( ) |

**DECLARATION OF BENJAMIN WAISBREN IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS**

I, Benjamin Waisbren, hereby declare the following under penalty of perjury:

1.      I am over the age of 18 and am fully competent to make this declaration (the "Declaration").  I am the Chief Restructuring Officer ("CRO") of the above-captioned debtor, NanoMech, Inc. (the "Debtor" or "NanoMech").

2.      This Declaration is made in support of the Debtor's petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and each of the motions and application for relief (collectively, the "First-Day Pleadings") filed on the date hereof (the "Petition Date").  I am authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

3.      I am a financial and special situations advisor with a multi-faceted business, investment banking, asset management, special-situation investing, structured finance, and legal background, including over 30 years of experience in restructuring and finance.  I have a B.A. from Boston University and a J.D. from the University of Wisconsin Law School.  I began my career in 1982 as a bankruptcy lawyer in Milwaukee and subsequently joined the Chicago office of Lord, Bissel & Brook (now Locke Lord) as a partner in 1990, where I developed a national corporate reorganization and bankruptcy litigation practice.

---

[1]     The last four digits of the Debtor's federal tax identification number are 3143.  The Debtor's service address for the purpose of this chapter 11 case is: 2447 Technology Way, Springdale, AR 72764.

4.      After approximately 13 years of practice, I joined Salomon Brothers, Inc. (now Citigroup) to lead its global restructuring advisory group in New York (in the Mergers and Acquisitions Department) as a Managing Director.  I later joined a global hedge fund, Stark Investments, as a Managing Director, where I was responsible for the firm's entry into new alternative asset class investment and trading strategies (including par loans, leveraged loans, and media private equity), as well as managing direct lending and private equity transactions in the U.S. and Europe, and litigation and workouts in major chapter 11 cases.  In early 2007, in partnership with Citigroup, I founded and became the president of Continental Entertainment Capital LP, a proprietary media and entertainment loan and equity investment origination and underwriting platform based in New York, Los Angeles, and Paris, until the end of 2018 (when Citigroup  ceased proprietary trading strategies as a result of the financial crisis).

5.      After spending several years working as an independent financial advisor in the media sector and producer, I returned to the practice of law with Winston & Strawn LLP in early 2013.  At Winston, I concentrated on "rated" structured finance transactions, as well as bankruptcy and restructuring matters.  Also, during my time at Winston, I was asked to serve as president of LSC Film Corporation in early 2014, an entity that co-financed 30 major motion pictures in partnership with Sony Pictures (Columbia, TriStar, and Sony Pictures Animation), for which I was the financial architect and originator  At that time, I also entered into an executive producing agreement with Sony Pictures Entertainment.  Through my work in the financial services industry and media finance, I have developed quantitative and modeling knowledge and skills.  While President of LSC Film Corp.,  I retired as a partner from Winston & Strawn in the Summer of 2017.  Before and after my retirement, I was engaged by the United States Department of Justice as its financial advisor and industry consultant in a civil forfeiture case, entitled *United States v.*

*"The Wolf of Wall Street" Motion Picture*, Case No. 2:16-cv-05362 (C.D. Cal.).  While at Winston, initially, my role (under Winston's engagement) was as "Information Agent", a non-attorney client relationship role akin to a chapter 11 examiner; and later, that position changed.  I was engaged, through my business entity, Virtually There, LLC,  as a financial and industry advisor by the United States Department of Justice under a government contract.

6.      I began serving as the CRO of the Debtor on March 7, 2019 pursuant to a resolution adopted by the Board of Directors, whereby I report to the Board.  As part of my duties as CRO, I have been overseeing and advising the Debtor on its day-to-day operations, budgets, cash flows, asset dispositions, anticipated bankruptcy compliance, negotiations with key suppliers, communications with key suppliers, negotiations with the Debtor's senior lenders, communications and consultations with employees, and overall restructuring and reorganization efforts.

7.      At the time of my retention, the Debtor's operations were at a near-standstill. Vendors in the Debtor's supply chain were not shipping, the Debtor had almost no liquidity, and key customers were not submitting purchase orders.  The Debtor was within days of a complete shutdown of operations and a consequent forced liquidation.  As set forth below, that condition has changed.  With a reduction in employee overhead, a key vendor agreement, the delivery of product to customers, the renewal of customer purchase orders (from a frozen state), and the pre-petition advance of additional secured credit by the Debtor's senior lender (*see*, Paragraph 33, below), the Debtor is now in a position to continue as a going concern through these proceedings and thereafter.  To illustrate the improvement in operations, existing purchase orders from customers now total over six times the purchase orders total for the Debtor in January, 2019.

8.      I have reviewed the First-Day Pleadings.  To the best of my knowledge, I believe that approval of the relief requested in the First-Day Pleadings is necessary to minimize disruption to NanoMech's business operations, permit an effective transition into chapter 11 proceedings, and preserve and maintain the value of NanoMech's estate.  I also believe that, absent immediate access to cash collateral and post-petition financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as set forth herein and as described in the First-Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of its estate.

9.      All the facts and opinions set forth in this Declaration are based on my experience, knowledge and information concerning the Debtor's operations and business financials; my review of relevant documents; information provided to me or verified by other officers or employees of the Debtor; and conversations with other members of the Debtor's management.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  If called to testify, I would testify to the facts and opinions set forth herein based on my personal knowledge, my review of relevant documents, and my investigation.

10.      Part I of this Declaration provides an overview of the Debtor's business operations, capital structure, and financial standing.  Part II of this Declaration describes the circumstances of the commencement of the above-captioned case.  Part III of this Declaration sets forth the facts relevant to the various First-Day Pleadings and the Debtor's business judgment in seeking such relief, and my bases for concluding that the relief requested in the First-Day Pleadings is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.

## I.    OVERVIEW

### A.    Business Overview

11.    NanoMech is a nanotechnology company and a leader in applying proprietary technologies in surface engineering and material-science manufacturing of lubricants, specialty chemicals, pastes, paints, coatings, and advanced textiles.  NanoMech generates revenue by selling products containing its innovative, patent-protected nanotechnologies.

12.    NanoMech was founded in approximately 2002 by Dr. Ajay P. Malshe, a Distinguished Professor in the College of Engineering at the University of Arkansas.  For many years, Dr. Malshe served as NanoMech's Chief Technology Officer.

13.    Early in the company's history, Dr. Arpana Verma, who was then completing her doctoral research under Dr. Malshe, worked in collaboration with Dr. Malshe to invent the technology used in NanoMech's nGlide products, which products make up the majority of the Debtor's current sales volume.  NanoMech's nGlide product line is a series of advanced lubricants that  reduce friction by orders of magnitude as compared to traditional lubricants.

14.    nGlide products are principally used by customers in the oil and gas services industry.  In fact, approximately two-thirds of NanoMech's overall sales revenues come from customers in the energy industry..

15.    In addition to the revenue it generates, NanoMech's nGlide business is significant because of two large barriers to entry into this market for potential competitors.  First, NanoMech has rights to the intellectual property, including several patents and patent applications for inventions that form the basis of nGlide's formulation.  Second, NanoMech supplies branded products to its major customers, which products have been specified and validated by these customers' engineers after rigorous and time-consuming analysis and testing.  A proposed

competitive product would have to go through a new validation process with each potential customer, which process can take months or years for approval.

16.    In addition to nGlide, NanoMech has several other product lines that also rely on its patented and patent-pending technology.  For example, NanoMech's TuffTek products consist of coatings used by automobile and aircraft manufacturers on bits that cut aluminum and steel, as well as wood building products  Other divisions of NanoMech, such as Guardx and nGuard, also involve sales of products that rely on NanoMech's patented technology.  All of these product lines rely on technology that is exclusively owned by or licensed to NanoMech.

17.    NanoMech's innovative products—and, primarily, the success of its nGlide product line—are the principal reason for Debtor's ability to operate today, despite a historical pattern of undercapitalization, operating losses and spending of invested capital on non-revenue producing initiatives and overhead. After raising substantial equity, debt, and public financing from the State of Arkansas, NanoMech grew from a single laboratory developing products to an ISO-certified manufacturer of multiple product lines.  At one time, NanoMech had as many as 51 full-time employees working in Houston, Texas; Dallas, Texas; Springdale, Arkansas; and Detroit, Michigan.  Its employee ranks now total about half that number, and yet, based on recent developments, such reduction in headcount and overhead will not adversely affect top line sales. In fact, as indicated above, purchase orders are on the increase, now that key vendor and customer confidence is being restored, and as a result, current asset levels are increasing.  To be sure, significant sales growth will require additional working capital and staffing, but such an investment in capital would be rational based on substantial industrial capacity that exists, meaning more sales can be achieved without additional investment in capital equipment.

18.     Upon Dr. Malshe's departure from the company in December 2017, Dr. Verma served as NanoMech's Chief Technology Officer, working in the Houston Office, until April 12, 2019.  In light of NanoMech's lack of capital to fund research and development, as well as the fact that NanoMech's laboratories and other scientists are located at the Debtor's Springdale, Arkansas facility, Dr. Verma and Debtor mutually agreed that her distinguished career would be better served if she were to leave the Company and resign from its Board of Directors.

19.     The Debtor currently employs two PhD scientists who are an integral part of its operations.  In addition to the Debtor's patented technologies, the knowhow of these employees in the application and use of those technologies is equally important, and represents another bar to market entry by competitors.

**B.      Corporate History and Organizational Structure**

20.     In March 2003, NanoMech's predecessor entity, NanoMech, LLC, was formed as an Arkansas limited liability company.

21.     In approximately December 2007, a second entity, Duralor, LLC, was also formed as an Arkansas limited liability company for the purpose of what ultimately became NanoMech's TuffTek business line.  NanoMech, LLC held a majority of the equity interests in Duralor, LLC.

22.     On May 28, 2010, Duralor, LLC was merged with and into NanoMech, LLC.  On the same date, the surviving entity, NanoMech, LLC, was converted into a Delaware corporation, NanoMech, Inc.

23.     NanoMech has four wholly owned subsidiaries: NanoMech Energy, Inc.; Convergent Materials, Inc.; NanoMech Holdings, LLC; and Nano Corporation of America, LLC. These four entities have no assets or liabilities and are used for the sole purpose of paying franchise taxes.  I do not anticipate that these entities will need to seek relief under the Bankruptcy Code.

C.      **Summary of Prepetition Capital Structure**

     i.      *Secured Debt*

       a.      <u>Arvest</u>

24.      On December 19, 2013, NanoMech and Arvest Bank ("<u>Arvest</u>") entered into that certain Promissory Note and Security Agreement (the "<u>Arvest Agreement</u>").  Under the Arvest Agreement, Arvest extended a loan to NanoMech in the principal amount of $1,781,906.00 (the "<u>Arvest Loan</u>") for the purpose of working capital and construction costs in connection with real property owned by NanoMech located at 2447 Technology Way in Springdale, Arkansas (the "<u>Manufacturing Facility</u>").  The Arvest Loan has an interest rate of 5% per annum and had an original maturity date of December 18, 2018, which has subsequently been extended to April 18, 2019.

25.      NanoMech's obligations under the Arvest Agreement are secured by (i) a mortgage executed by NanoMech in favor of Arvest on the Manufacturing Facility (the "<u>Arvest Real Property Collateral</u>") dated December 19, 2013 (the "<u>Arvest Lien</u>"), and (ii) a security interest in all of NanoMech's "goods, accounts, general intangibles and other items of tangible and intangible personal property now owned or hereafter acquired by [NanoMech] and located on or intended for use in or arising from the construction or ownership of real property and improvements thereon" located at the Manufacturing Facility, as more fully described in the Arvest Agreement (the "<u>Arvest Personal Property Collateral</u>," and collectively with the Arvest Real Property Collateral, the "<u>Arvest Collateral</u>").  Arvest Agreement ¶ 12(C).

       b.      <u>Arkansas Economic Development Commission</u>

26.      NanoMech and the Arkansas Economic Development Commission ("<u>AEDC</u>") are parties to that certain Loan Reimbursement Agreement dated December 19, 2013 (the "<u>AEDC Loan Agreement</u>"), under which the AEDC loaned funds to NanoMech to purchase and make

improvements to the Manufacturing Facility.  NanoMech's obligations under the AEDC Loan Agreement were originally evidenced by a promissory note (the "AEDC Note") in the principal amount of $1,500,000.  The AEDC Note has an interest rate of 5% per annum and had an original maturity date of December 19, 2016.  On December 16, 2016, NanoMech and the AEDC entered into that certain Extension and Modification Agreement (the "AEDC Modification Agreement"), under which, among other things, NanoMech and the AEDC agreed that the maturity date of the AEDC Note would be extended to December 19, 2019 and that NanoMech would begin making interest-only payments on January 19, 2017.

27.     The AEDC Loan Agreement provides that NanoMech's obligations under the AEDC Loan Agreement and evidenced by the AEDC Note would be secured by two liens (collectively, the "AEDC Liens"), namely: (i) a junior lien on the Manufacturing Facility, subordinate to the Arvest Lien; and (ii) a first lien on 7 acres of undeveloped real estate owned by NanoMech that lies adjacent to the Manufacturing Facility (the "7 Acre Property," and collectively with the Manufacturing Facility, the "AEDC Real Property Collateral").  In addition, as contemplated by the AEDC Loan Agreement, on December 19, 2013, NanoMech and AEDC entered into that certain Security Agreement (the "AEDC Security Agreement"), under which NanoMech granted the AEDC a security interest in "all Equipment of [NanoMech] as such term is defined in Ark. Code Ann. § 4-9-102 owned by [NanoMech], which Collateral is located in, at or upon [NanoMech's] Arkansas facilities" (the "AEDC Personal Property Collateral," and collectively with the AEDC Real Property Collateral, the "AEDC Collateral").  AEDC Security Agreement ¶ 2.  By agreement, AEDC's interest in the AEDC Personal Property Collateral was subordinated to Arvest's interest in the Arvest Personal Property Collateral.

28.    As noted in Part I.C.i.c, *infra*, on April 10, 2018, NanoMech and Michaelson Capital Special Finance Fund II, L.P. ("Michaelson") entered into the Original NPA (defined herein), which permitted NanoMech to use some of its proceeds to pay off existing obligations to the AEDC.  NanoMech's payment to the AEDC included a payment of $1,000,000 on the principal of the AEDC Note, plus another $29,315.08 in interest.  Thus, NanoMech believes that the unpaid principal amount under the AEDC Loan Agreement and AEDC Note is now $500,000, and the total unpaid amount including interest and fees is $508,332.32.  In addition, as required under the Original NPA, AEDC agreed to subordinate its interest in the AEDC Personal Property Collateral to Michaelson's interest in the Michaelson Collateral (defined herein).

c.    Michaelson and Advantage

29.    On April 10, 2018, NanoMech and Michaelson entered into that certain Note Purchase and Security Agreement (the "Original NPA").  Under the Original NPA, Michaelson loaned funds to NanoMech evidenced by a promissory note in favor of Michaelson in the principal amount of $5,000,000 (the "Original Note").  The Original Note has an interest rate of 8.5% per annum and a maturity date of April 10, 2022.  The Original NPA provided for NanoMech to use the proceeds of the Original Note (i) to repay certain loan obligations to the Arkansas Economic Development Commission ("AEDC"), the Springdale Public Facilities Board ("SPFB"), and Koch Minerals, LLC ("Koch"), and (ii) for working capital and other general corporate purposes. Original NPA ¶ 1.3.

30.    NanoMech's obligations under the Original NPA and the amendments thereto are secured by a security interest in and "Lien" (as defined therein) upon "all of [NanoMech's] personal property, tangible or intangible, and whether now owned or hereafter acquired, or in

which it now has or at any time in the future may acquire any right, title, or interest," as more fully described in the Original NPA (collectively, the "Michaelson Collateral").

31.    On April 19, 2018, NanoMech and Michaelson entered into that certain First Amendment to Note Purchase and Security Agreement (the "First NPA Amendment"), under which Michaelson loaned additional funds to NanoMech evidenced by a promissory note in favor of Michaelson in the principal amount of $2,000,000 (the "Bridge Note"). The Bridge Note has an interest rate of 10% per annum and a maturity date of April 19, 2019.

32.    On March 1, 2019, NanoMech, Michaelson, Southeast Community Development Fund VII, L.L.C. ("SCDF"), Advantage Capital Community Development Fund, L.L.C. ("ACCDF"), and CDVCA SUB-CDE IV, LLC ("CDVCA," and collectively with SCDF and ACCDF, "Advantage") entered into that certain Second Amendment to Note Purchase and Security Agreement (the "Second NPA Amendment"). Under the Second NPA Amendment, Advantage loaned additional funds to NanoMech in *pari passu* with NanoMech's obligations to Michaelson,[2] evidenced by three promissory notes in the total principal amount of $1,000,000 (the "Advantage Notes").[3] In addition, certain obligations owing to Advantage are subordinated to certain obligations owing to Michaelson, as set forth in Section 7 of the Third NPA Amendment (defined herein). Each of the Advantage Notes has an interest rate of 8.5% per annum and a maturity date of April 10, 2022.

33.    On March 22, 2019, NanoMech, Michaelson, and Advantage entered into that certain Third Amendment to Note Purchase and Security Amendment (the "Third NPA

---

[2]    Advantage has agreed that accrued and unpaid interest in respect of the Original Note and the Bridge Note accrued through and including the Second Amendment Effective Date (as defined in the Second NPA Amendment) will be paid prior to any other obligations under the NPA (as defined herein).

[3]    More specifically, the Advantage Notes consist of: (i) a promissory note in favor of SCDF in the principal amount of $680,000; (ii) a promissory note in favor of ACCDF in the principal amount of $144,000; and (iii) a promissory note in favor of CDVCA in the principal amount of $176,000.

Amendment"), under which Michaelson loaned an additional $250,000.00 to NanoMech, subject to the same interest rate per annum as the Original Note and payable on demand or, if earlier, upon any "Event of Default" (as defined by the NPA) or on the maturity date of the Original Note.  On or about April 4, 2019, Michaelson loaned an additional $200,000 to NanoMech under the Third NPA Amendment.

34.    In order to restore the Debtor's nGlide supply chain and ability to serve its key customers of that product, on April 5, 2019, NanoMech, Michaelson, and Axel Royal LLC ("Axel Royal") entered into that certain Amendment to Security Agreement and Open End Credit Agreement and Fourth Amendment to and Limited Consent under Note Purchase Agreement (the "Fourth NPA Amendment," and collectively with the Original NPA, the First NPA Amendment, the Second NPA Amendment, and the Third NPA Amendment, the "NPA").  Additional details regarding the Fourth NPA Amendment are set forth in Part I.C.i.d, *infra*.

d.    Axel Royal, LLC

35.    Axel Royal, a company based in Tulsa, Oklahoma, is a critical manufacturer and supplier of product that is used in the production of nGlide-branded products, as further detailed in Parts II.D and III.D, *infra*.  Axel Royal is not only a supplier of unique, difficult-to-source grease components, it is involved in the manufacture of the finished product, as well.  On January 28, 2019, NanoMech and Axel Americas, LLC ("Axel Americas," and collectively with Axel Royal, "Axel") entered into that certain Security Agreement (the "Original Axel Security Agreement"), under which NanoMech purported to grant Axel Americas "a first priority purchase money security interest in all future accounts receivable related to" goods supplied by Axel and sold to NanoMech's customers.  Original Axel Security Agreement at 1 & ¶ 1.  On the same date, NanoMech and Axel Americas also entered into that certain Open End Credit Agreement (the

"Original Axel Credit Agreement"), under which Axel Americas agreed to extend credit to NanoMech in the maximum amount of $600,000.00 for NanoMech's current and future purchases of goods from Axel.  Original Axel Credit Agreement ¶ 2.  NanoMech and Axel Americas agreed that the outstanding principal balance under the Original Axel Credit Agreement was $544,392.68 as of January 28, 2019.  When I learned of NanoMech's direction of payment that had been delivered to three key customers, and concluded that it had violated Michaelson's existing security agreement, I directed that such direction of payment  be terminated with written notice to the account receivable debtors.  I then commenced discussions with Axel Royal on how best to restore NanoMech's relationship with Axel Royal and NanoMech's critical supply chain for nGlide.  Among other things, I arranged for an advance from Michaelson (*see*, Paragragh 33, above) that enabled NanoMech to pay its entire outstanding obligation to Axel Royal, with the anticipation that the Debtor would seek to have Axel Royal designated a "key vendor" and (without such payment) would, if the motion were granted, have sought authority to pay Axel Royal post-petition.  This also set the stage for negotiations between Axel Royal and Michaelson, as well as discussions concerning Axel Royal's providing the Debtor with very favorable pre- and post-petition trade credit terms (which terms are now embodied in the Fourth NPA Amendment and Axel Security Agreement, as described below).  Simply put, this tri-party arrangement saved NanoMech from shutting down operations and liquidating and has resulted in an increase of total orders from customers at over six times the purchase order level in January.

36.    Of course, Michaelson asserted that NanoMech's entry into the Original Axel Security Agreement and Original Axel Credit Agreement violated NanoMech's obligations under the NPA.  Thus, as noted above, on April 5, 2019, NanoMech, Axel Royal, and Michaelson entered into the Fourth NPA Amendment.

37.     Under the Fourth NPA Amendment, the parties amended the Original Axel Security Agreement (as amended, the "Axel Security Agreement") to provide for NanoMech to grant Axel security interests in certain "Axel Goods" (as defined therein) supplied by Axel to NanoMech and delivered to either NanoMech or NanoMech's customers, and the proceeds thereof (collectively, the "Axel Collateral").  As amended, the Axel Security Agreement further provides that the security interests granted to Axel secure only "the unpaid amount of the charges owing by NanoMech to Axel for the sale and processing of such Axel Goods by Axel" and "shall be treated as purchase money security interest(s), as described in Section 9-103 of the Missouri Uniform Commercial Code."  Axel Security Agreement ¶¶ 1, 3.  In addition, as amended, the Axel Security Agreement sets forth procedures under which, among other things, (a) NanoMech and Axel may authorize NanoMech's customers to pay amounts owed to NanoMech directly into a "Designated Account" (as defined therein) selected by the parties, (b) Axel may withdraw from the Designated Account only those amounts owed by NanoMech to Axel in connection with the underlying goods, and (c) any remaining funds shall be remitted to NanoMech within three business days of the payment being made, all as more fully detailed in the Axel Security Agreement.  *Id.* ¶ 8.

38.     Additionally, as part of the Fourth NPA Amendment, the parties amended the Original Axel Credit Agreement (as amended, the "Axel Credit Agreement," and collectively with the Axel Security Agreement, the "Prepetition Axel Agreements") to provide for Axel to make additional credit advances to NanoMech for the purchase of goods by NanoMech.

39.     In addition, under the Fourth NPA Amendment, among other things, Michaelson (a) consented to NanoMech's entry into the Axel Security Agreement; (b) agreed that Axel will have a first priority perfected security interest in the Axel Collateral to secure an aggregate amount of Secured Obligations (as defined in the Axel Credit Agreement) in an aggregate amount not to

exceed $750,000, subject to the terms set forth in the Fourth NPA Amendment; and (c) released Axel and its affiliates from certain claims, all as further detailed in the Fourth NPA Amendment.

## ii.    *Unsecured Debt*

### a.    Trade Debt

40.    NanoMech's unsecured debt includes various debts to its suppliers and vendors incurred in the ordinary course of business.  As of the date hereof, NanoMech's total unsecured trade debt is approximately $1,581,700.00.

### b.    Arkansas Economic Development Commission

41.    On December 19, 2013, NanoMech and the AEDC entered into that certain Grant Reimbursement Agreement (the "Grant Reimbursement Agreement"), under which the AEDC issued a grant of $1,000,000 to NanoMech (the "Grant") for the purpose of purchasing and making improvements to the Manufacturing Facility, the funding of development and project costs related thereto, and the financing of inventory and accounts receivable.  The Grant Reimbursement Agreement obligated NanoMech to reimburse the Grant to the AEDC, but permitted NanoMech to do so by meeting certain employment requirements by December 19, 2016.  The AEDC Modification Agreement, described above, subsequently extended this deadline to December 19, 2017.

42.    On September 28, 2018, NanoMech and the AEDC entered into that certain Second Extension and Modification Agreement (the "Second AEDC Modification Agreement"), under which, among other things, the parties agreed that the unreimbursed amount of the Unsecured Grant was $500,000 as of the date thereof, and the maturity date under the Unsecured Grant Reimbursement Agreement was extended to December 19, 2019.

c.    Convertible Notes

43.    In early 2017, NanoMech began to market certain convertible promissory notes (collectively, the "Convertible Notes"), as further detailed in Parts II.A and B, *infra*. NanoMech ultimately issued Convertible Notes on the dates and amounts listed in **Exhibit 1** to this Declaration.[4] Each of the Convertible Notes has an interest rate of 8% per annum and a maturity date of one year after its issuance.

44.    Each of the Convertible Notes states that, if NanoMech establishes and issues "Series D Preferred Stock" (as defined therein) to investors, resulting in a "Qualifying Financing" (as defined therein) before the maturity date of such Convertible Note, the holder of such Convertible Note may elect to convert all or a portion of NanoMech's obligations thereunder into shares of Series D Preferred Stock, all as further detailed in the Convertible Notes. As of the date hereof, NanoMech has not yet authorized any Series D Preferred Stock.

45.    To date, NanoMech has issued Convertible Notes in the aggregate principal amount of $4,150,000.00.

iii.    *Common and Preferred Shares*

46.    As of the date hereof, NanoMech has issued approximately 6,112,210 shares of common stock. I understand that the individuals and entities listed in **Exhibit 2** hereto own 10% or more of NanoMech's shares of common stock.

47.    Additionally, NanoMech has engaged in multiple efforts to raise capital over the years to attracting investors, resulting in three series of preferred shares: Series A, Series B, and

---

[4]    As further detailed in Exhibit 1 and in Parts II.A and B, *infra*, NanoMech issued Convertible Notes both before and after it entered into the Original NPA. Certain holders of Convertible Notes issued before the date of the Original NPA executed that certain Consent dated April 2018 (the "NPA Consent"), in which they consented to issuance of the Original Note, as further detailed in Exhibit 1. In addition, certain holders of Convertible Notes have agreed to subordinate the obligations arising under such Convertible Notes to the obligations arising under the NPA, as further detailed in Exhibit 1.

Series C.  More specifically, NanoMech raised approximately $1.6 million in connection with its Series A investors between 2005 and 2009; approximately $11.3 million in connection with its Series B investors in 2014; and approximately $10.7 million in connection with its Series C investors in 2016.  In connection with these investments, NanoMech has issued 1,411,289 Series A preferred shares; 3,663,480 Series B preferred shares, and 3,244,940 Series C preferred shares. I understand that the individuals and entities listed in **Exhibit 3** hereto own 10% or more of any single class of NanoMech's preferred stock.

## II.    EVENTS LEADING TO BANKRUPTCY

### A.    NanoMech's Historic Undercapitalization and Marketing Efforts

48.    NanoMech's foundation is its innovative nanotechnology, as explained above. Over the years, however, NanoMech has been undercapitalized, particularly in light of investments of capital in overhead and R&D that did not produce a return, and this negatively impacted liquidity and business operations.

49.    As noted above, throughout NanoMech's history, it has attracted many outside investors and raised millions of dollars of capital.  However, continuing losses from operations, company investments in research and development, and other costs,, together with a slow growth in revenues, all contributed to an erosion of NanoMech's capital base.  As a consequence, much of NanoMech's efforts and overhead expenses were devoted to raising additional risk capital.

50.    In late 2016 and early 2017, NanoMech pursued a fourth round of preferred-equity capital raising.  In January 2017, NanoMech retained Stifel, Nicolaus & Co., Inc. ("Stifel"), a financial services firm, to represent it under a nonexclusive engagement in connection with the marketing and promotion of NanoMech's potential Series D Preferred Shares.

51.    Stifel attempted to market NanoMech's securities to at least 200 potential investors. Despite these efforts, Stifel succeeded in attracting less than $5 million in investments, which were

in Convertible Notes rather than an offering of Series D Preferred Shares. As noted above, the Convertible Notes had an interest rate of 8% and a maturity date of one year from the date of issuance, and were convertible into Series D Preferred Shares at the option of the holder. Thus, I understand that the Convertible Notes were debt securities.

52.    To authorize Series D Preferred Shares, NanoMech was required to obtain consent from its Series B and Series C preferred shareholders. From early 2017 to the present, NanoMech was unable to obtain the requisite consent from its Series B and Series C preferred shareholders for the authorization of Series D Preferred Shares.

53.    In March 2017, NanoMech began to issue the Convertible Notes, as described above. In July 2017, Koch invested approximately $2 million in NanoMech and received a Convertible Note. As a condition to Koch's purchase of a Convertible Note, NanoMech was ultimately required to provide security for its obligations to Koch under the Convertible Note. Thus, following the issuance of Koch's Convertible Note, Koch asserted security interests in various assets of NanoMech, including real property and intellectual property.[5]

54.    NanoMech's former Chairman and Chief Executive Officer, James Phillips, terminated the Stifel engagement in October 2017 due to the failure to raise sufficient capital. NanoMech subsequently entered into other non-exclusive engagements with individuals and firms to promote its potential Series D preferred shares to potential investors.

55.    Specifically, in October 2017, NanoMech entered into an engagement with Rainmaker Securities, LLC ("Rainmaker"). The terms of NanoMech's engagement of Rainmaker provided, among other things, that NanoMech would issue warrants to Rainmaker each month in lieu of a cash retainer, and that Rainmaker was eligible to receive success fees (paid in cash) based

---

[5]    As noted above, under the Original NPA, NanoMech used proceeds from the Original Note to pay off its obligations to Koch under the Convertible Note described in this paragraph.

on the debt and equity investments it brought in.  Ultimately, NanoMech issued common stock warrants to Rainmaker for a total of 90,540 shares and paid Rainmaker a total of $168,000.00 in success fees.

56.     In August 2018, NanoMech also entered into an engagement with Knollwood Capital, LLC ("Knollwood"), under which NanoMech paid a monthly retainer of $2,000 for consulting and advisory services in connection with its potential series D preferred shares.  While the terms of Knollwood's engagement also included potential success fees, NanoMech never paid any such success fees to Knollwood.  In 2018, Austerlitz Capital, LLC also provided services to NanoMech on a non-exclusive basis in exchange for a potential success fee, but NanoMech never made any payments in connection with this engagement.

57.     In early 2018, NanoMech also explored the potential sale of its TuffTek division to one of its customers, but these discussions stalled early on.

**B.     NanoMech's Defaults Under the NPA**

58.     In April 2018, the Original Note and Bridge Note provided NanoMech with additional liquidity.  However, the NPA placed certain obligations on NanoMech with respect to seeking outside investors.  First, NanoMech was required to "complete an equity offering of shares of Preferred Stock generating net proceeds to [NanoMech] in the principal amount of no less than $4.0 million on or before September 30, 2018."  Original NPA ¶ 4.7.  Second, NanoMech was required to "convert all of the outstanding [Convertible Notes] into shares of Series C Preferred Stock or another series of Preferred Stock in accordance with the terms of such [Convertible Notes]" on or before the same date.  *Id.* ¶ 4.9.  Third, NanoMech promised that it would refrain from creating, incurring, assuming, or permitting to exist any "additional Indebtedness (including Purchase Money Indebtedness) incurred after the Closing Date" in an aggregate amount of

$200,000 or more without Michaelson's written consent. *Id.* ¶ 5.2(b). Additionally, the First NPA Amendment provides:

> [I]n the event that [NanoMech] closes one or more debt or equity financing rounds ("Financing Transactions") while the Bridge Note remains outstanding, (x) twenty five percent (25%) of the first $4,000,000 in gross proceeds payable to [NanoMech] in connection with such Financing Transactions shall be used to repay the Obligations under the Bridge Note, and (y) fifty percent (50%) of the next $2,000,000 in gross proceeds payable to [NanoMech] in connection with such Financing Transactions shall be used to repay the Obligations under the Bridge Note. Any such repayment of the Bridge Note shall occur simultaneously with the closing of such Financing Transactions.

First NPA Amendment ¶ 1.14(b).

59.    However, after the closing of the Original NPA, NanoMech continued to issue Convertible Notes to investors without notifying Michaelson or obtaining Michaelson's written consent. First, on June 28, 2018, NanoMech issued a Convertible Note in the principal amount of $1,000,000 (the "Carroll Note") to Daniel Carroll, who was then an employee of NanoMech. Second, on August 30 and September 24, 2018, NanoMech issued two Convertible Notes, each in the principal amount of $1,000,000 (collectively, the "Partridge Notes"), to the Waring and Carmen Partridge Foundation.

60.    Initially, Michaelson was not aware of the existence of the Carroll Note or the Partridge Notes. NanoMech also did not pay any proceeds of the Carroll Note or the Partridge Notes to Michaelson.

61.    In or around August 2018, Michaelson learned about NanoMech's issuance of the Carroll Note and the Partridge Notes. In September 2018, Michaelson raised the possibility that an "Event of Default" (as defined in the NPA) had occurred. On September 6, 2018, Michaelson sent an email to NanoMech mentioning the possibility of an Event of Default.

62.     On October 16, 2018, Michaelson's outside counsel sent a letter to NanoMech's outside counsel identifying various events that could constitute an Event of Default under the NPA, but stating that Michaelson would consider forbearing from declaring an Event of Default and exercising its remedies under the NPA if NanoMech met certain conditions, including payment of $750,000 to Michaelson and execution of a subordination agreement with Waring and Carmen Partridge by October 23, 2018.  Despite NanoMech's attempts, it was unable to meet these conditions.

63.     On November 9, 2018, Michaelson exercised its right under the NPA and a related agreement with Arvest to sweep NanoMech's operating bank account (the "Arvest Account"). Shortly thereafter, the parties began to negotiate a formal forbearance agreement.

64.     On November 18, 2018, NanoMech and Michaelson entered into that certain Forbearance Agreement (the "Forbearance Agreement").  Under the Forbearance Agreement, NanoMech and Michaelson agreed, among other things, that: (i) as of the date thereof, NanoMech was indebted to Michaelson in the aggregate principal amount of $7,430,769 under the Original Note and the Bridge Note; (ii) certain "Events of Default" had occurred under the NPA; (iii) Michaelson would temporarily forbear from exercising additional rights and remedies under the NPA; and (iv) Michaelson would return to NanoMech a portion of the funds it previously swept from the Arvest Account.  Furthermore, NanoMech made a series of additional covenants to Michaelson, including that NanoMech would (i) pay Michaelson an additional $100,000 by December 1, 2018 and (ii) convert all of its issued and outstanding Convertible Notes into shares of Series D preferred stock by December 31, 2018.  Forbearance Agreement ¶ 4.  In addition, NanoMech reaffirmed its covenants under the Original NPA, which include a covenant not to incur additional debts exceeding $200,000 without Michaelson's consent.  *Id.* ¶ 8; Original NPA ¶ 5(b).

65.     NanoMech was unable to meet any of these obligations.  In addition, NanoMech issued new Convertible Notes after the execution of the Forbearance Agreement.  On November 9, 2018, NanoMech issued a Convertible Note in the principal amount of $500,000 to the John D. Bertuzzi Revocable Trust, and on January 23, 2019, NanoMech issued a Convertible Note in the principal amount of $50,000 to John Acker.  Thus, NanoMech was ultimately unable to comply with the Forbearance Agreement.

### C.     Prepetition Litigation

66.     On February 4, 2019, Michaelson initiated litigation against NanoMech in the Supreme Court of the State of New York, County of New York, Case No. 650704/2019 (the "Michaelson Litigation"), by filing a Notice of Motion for Summary Judgment in Lieu of Complaint (the "Michaelson MSJ").  In the Michaelson MSJ, Michaelson alleged that NanoMech was indebted to Michaelson for a total outstanding amount for a total outstanding amount of $8,909,830 as of January 1, 2019, plus interest, fees, costs, and expenses.

67.     On April 3, 2019, NanoMech and Michaelson executed that certain Stipulation, Order and Judgment (the "Michaelson Stipulation"), which resolved the Michaelson Litigation.  In the Michaelson Stipulation, NanoMech agreed that the Michaelson MSJ should be granted that the court should enter judgment in the total amount of $8,909,830, plus post-judgment interest at the rate of 9% per annum, against NanoMech, with the parties to bear their own attorneys' fees, expenses, and costs.

68.     In addition, on March 25, 2019, Daniel Carroll filed a Complaint against NanoMech in the U.S. District Court for the Western District of Arkansas, Case No. 5:19-cv-05055-PKH (the "Carroll Litigation"), alleging that NanoMech has defaulted on the Carroll Note.  Carroll's Complaint demands payment of damages in the amount of $1,058,958.90, plus costs and expenses in bringing the action, pre-judgment and post-judgment interest, and attorneys' fees.  To the best

of my knowledge, as of the date hereof, NanoMech has not yet received service of process in the Carroll Litigation.

### D. NanoMech's Struggles with Liquidity and Impacts on Supplier and Customer Relationships

69.     NanoMech continued to struggle to maintain adequate liquidity in early 2019, despite its receipt of funds from issuing additional Convertible Notes in late 2018.  NanoMech soon found itself substantially behind on its accounts payable, which, in turn, had a major impact on relationships with suppliers and customers.

70.     As noted above, Axel Royal is a key supplier for NanoMech's nGlide products.  In early 2019, NanoMech was unable to remain current on its obligations to Axel Royal.  Previously, Axel Royal had extended credit of $300,000 to NanoMech, but NanoMech had already reached this limit.  In addition, NanoMech's balance with Axel Royal was severely past due.  As a result, Axel Royal refused to continue providing supplies for nGlide unless NanoMech granted Axel Royal a purchase money security interest in supplies that NanoMech purchased from Axel Royal and NanoMech's accounts receivable associated therewith.

71.     Accordingly, on January 28, 2019, NanoMech and Axel Americas entered into the Original Axel Security Agreement and Original Axel Credit Agreement, as described above. Without Axel Royal's willingness to extend credit to NanoMech at this critical time, NanoMech would have been unable to continue selling nGlide products to its customers, which would have jeopardized its entire business.

72.     As described above, NanoMech also entered into the Third NPA Amendment with Michaelson and Advantage on March 1, 2019.  The Third NPA Amendment increased NanoMech's secured debt but also provided it with additional liquidity of almost $1 million. However, only approximately half of these funds remained available for NanoMech's ongoing

operations, because around this time, NanoMech also entered into a separation agreement with its former Chairman and CEO, James Phillips.  NanoMech ultimately used approximately half of the funds received from Advantage to pay amounts owed to Phillips under his separation agreement and to make payments on account of two promissory notes for compensation that NanoMech had failed to pay Phillips over eight months prior.

### E.    NanoMech's Retention of a CRO

73.    Shortly after execution of the Third NPA Amendment, NanoMech's Board of Directors, in light of the increasingly severe liquidity shortfall faced by NanoMech and the pending Michaelson MSJ, began exploring restructuring alternatives and sought to retain professional restructuring help.  On March 7, 2019, NanoMech's Board of Directors authorized my retention as CRO.

74.    When my CRO engagement began, NanoMech was at risk of imminent shutdown and liquidation.  NanoMech was struggling to make payroll and was unable to remain current with its key suppliers, such as Axel Royal.  There were also serious questions as to whether NanoMech would have ongoing support from Michaelson, its senior lender..  Based on the Forbearance Agreement and Michaelson's pending MSJ, there was a substantial risk that Michaelson would obtain a judgment and seek to foreclose on its collateral.

75.    Thus, one of my first steps in my role as CRO was to engage in discussions with Michaelson concerning, among other things, a consensual, pre-planned chapter 11 filing, and associated debtor-in-possession financing and use of cash collateral agreement.  Constructive discussions with Michaelson led to additional credit advances under the NPA.  As described above, since my engagement, Michaelson has advanced $450,000 in additional funds to NanoMech.  In addition, NanoMech has negotiated debtor-in-possession financing and the Debtor's ability to use cash collateral with Michaelson, as detailed below.

76.     Another early step during my tenure as CRO was to advise the Board of Directors regarding necessary employee layoffs in order to reduce overhead and preserve cash. Accordingly, NanoMech, regrettably, terminated certain employees, resulting in a reduction of monthly payroll expenses by over one-third. Early on, I met with all of NanoMech's employees, and explained the challenges ahead, including the expected layoffs and the process of commencing a proceeding under chapter 11 of the Bankruptcy Code. I have since led another "all-hands" meeting with the employees, and the employees, including remaining scientists and senior executives, are, indeed, committed to seeing the Debtor continue as a going concern and build value for its stakeholders.

77.     In addition, to reduce overhead, I have managed the closing of unnecessary and very costly offices in Dallas and Houston. The Dallas office space has been returned to the landlord and the furniture has been liquidated. Upon NanoMech's vacating the Dallas office, the landlord signed a lease for a new tenant, resulting in a substantial mitigation of damages. The Debtor anticipates rejecting its lease to the Houston Office, as it's not necessary to business operations. The closing of these offices will save the Debtor over $300,000/year, I have been informed, without any negative impact on sales.

78.     I now have a strong, complimentary working relationship with Senior Vice President of Finance and Operations Wyatt Watkins (the company's COO), and have been working closely with the President of NanoMech Energy and the Director of Sales (two key employees). I have met privately with the technical staff to better understand their views on operations and staffing. The objective of all these efforts has been to build a consensus and enable me to better advise the Board of Directors on restructuring alternatives and capital needs.

79.     A major component of my work as CRO has been to help stabilize NanoMech's relationships with both its critical suppliers and its major customers. A highlight of these efforts

has been the Fourth NPA Amendment.  The amended agreements with Axel Royal have preserved NanoMech's ability to purchase goods from Axel Royal, significantly enhancing NanoMech's ability to continue operating its key nGlide business.  In addition, because Michaelson alleged that the Original Axel Security Agreement violated the NPA, I worked with Michaelson to obtain its consent to the amended Axel Security Agreement as part of the Fourth NPA Amendment, and fostered an agreement between Axel Royal and Michaelson.  The Fourth NPA Amendment ensures NanoMech's continued relationship with its key supplier, with pre-negotiated post-petition trade-credit terms that will substantially lower the Debtor's debtor-in-possession financing needs.

80.    Finally, I have been assisting the Senior Vice President of Finance and Operations with financial modeling, based on my experience with modeling credit transactions, corporate finance transactions, and structured finance transactions in my various professional and business capacities.   These are just a few examples of my efforts and initiatives to help stabilize NanoMech's business over the past several weeks.  I have devoted my efforts to NanoMech on a full-time basis, seven-days-a-week, spending well more than business hours on this assignment. My engagement is based on a fixed monthly retainer, as requested by the Board (as opposed to an hourly fee arrangement).  I am currently not active on any other professional engagement.

**F.    NanoMech's Decision to File for Chapter 11 Relief**

81.    NanoMech needs to reorganize its capital structure under chapter 11; or, in the alternative, sell its assets as a going concern under section 363(b) of the Bankruptcy Code, if it is to preserve enterprise value for the benefit of stakeholders.  Without DIP financing and the use of cash collateral, NanoMech will not be able to operate as a going concern.  Due to its valuable intellectual property, product know-how, and blue-chip customers, NanoMech has significant potential to operate profitably and grow substantially in the future (including, but not limited to, developing additional industrial capacity and setting up manufacturing and sales operations in

foreign jurisdictions), once the business is properly recapitalized for product development and expansion.  NanoMech's production capacity is not fully utilized, primarily because of its recent liquidity shortfall and arrearages with key suppliers.  NanoMech's recent progress with key suppliers and customers is encouraging, and is an objective illustration of how, despite its financial and past operational issues, NanoMech's major customers continue to want to use the Debtor's products in manufacturing and in the field.  In short, this shows NanoMech's competitive attributes and advantages; it's a tech company that has not been able to exploit fully it's valuable intellectual property and product know-how.  With appropriate levels of working capital and investment, I now believe it can.

82.    Michaelson has now agreed to provide debtor-in-possession financing to NanoMech, as well as to allow the Debtor to use cash collateral without having to pay adequate protection payments.  The Debtor is now exploring its restructuring alternatives, including the sale of substantially all of its assets under section 363(b) of the Bankruptcy Code.  The Debtor intends to seek authorization to engage identified investment bankers to manage a sale and/or plan formulation process, targeted at potential financial and industry investors/buyers.

## III.    FIRST-DAY PLEADINGS[6]

### A.    Motion  for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain, Continue, and Renew its Property, Casualty, Liability and Other Insurance Policies and Agreements, and (II) Honor all Obligations in Respect thereof (the "Insurance Motion")

83.    The Debtor maintains various insurance programs providing coverage for, among other things, business owner property and general liability, employment benefits liability, workers' compensation liability, employment practices liability, commercial property liability, crime, cyber

---

[6]    Capitalized terms not otherwise defined in Part III of this Declaration shall have the meanings assigned in the relevant First-Day Pleadings.

security, business auto, errors & omissions, directors and officers liability, fiduciary liability, and commercial umbrella (collectively, the "Insurance Programs"). The Insurance Programs include coverage primarily from the insurance policies listed on Exhibit A hereto (the "Insurance Policies"), which the Debtor has obtained through third-party insurance carriers (the "Insurance Carriers").

84.     The Debtor seeks entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and (b) pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "Insurance Obligations") in the ordinary course of business and pay prepetition obligations in respect thereof.

85.     In connection with its business operations, the Debtor maintains multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtor operates and various contractual obligations. The Insurance Policies include (a) general liability, (b) business auto liability, (c) umbrella liability, (d) crime, (e) property, (f) cyber, (g) directors and officers liability, (h) employment practices liability, (i) fiduciary liability, and (j) workers' compensation and employers' liability.

**B.      Motion to (I) Approve Maintenance of Certain Prepetition Bank Accounts and Cash Management System and (II) Continue Use of Existing Checks and Business Forms ("Cash Management Motion")**

86.     Cash Management System.  Prior to the Petition Date, the Debtor managed its cash, receivables, and payables through the Cash Management System, which is designed to efficiently collect, transfer, and disburse funds.  The principal components of the Cash Management System

are (i) the Debtor's bank account with Today's Bank,[7] and (ii) controls and processes associated with the Debtor's cash management procedures.  The Debtor maintains accounting controls in connection with its Cash Management System and is able to accurately trace the funds flowing through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  As a result, the Debtor is able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

87.    <u>Procedures</u>.    The Debtor also follows the Procedures in connection with its disbursements.  I receive daily working capital reports that reflect the cash balances of the Debtor's bank accounts, receipts of collections of accounts receivable, and planned disbursements.  Such reports are provided at 9:00 a.m. (Central Standard Time) each business day and approved distributions are made at 3 p.m. (Central Standard Time) each business day.  For disbursements by check or wire, the Debtor's accounts payable clerk verifies and posts the relevant invoice, and the Debtor's Senior Vice President of Finance and Operations determines whether the Debtor has sufficient liquidity to make the proposed disbursement.  Disbursements are then provided to me for approval.  Similarly, I am notified daily of any payments made via Automated Clearing House.  The Debtor also pays Bank Fees to Today's Bank in the ordinary course of business.  The Bank Fees include fees and expenses related to wire transfers and other fees, costs, and expenses that are standard for a typical corporate bank account, which Today's Bank debits directly from the Debtor's bank account or which the Debtor pays in connection with wire transfers.

88.    <u>UST Operating Guidelines</u>.  I understand the United States Trustee ("<u>UST</u>") has established certain operating guidelines for debtors-in-possession to supervise the administration of chapter 11 cases.  Under the circumstances, a waiver of certain of the UST's requirements is

---

[7]    The Debtor also has an account with First Security Bank.  This account is not actively used in the Cash Management System.

warranted in this case.  These include guidelines that would, *inter alia*, require the Debtor to (i) close its existing bank accounts, (ii) open new bank accounts, (iii) make disbursements only by check with the designation "Debtor-in-Possession," (iv) modify its bank account signature cards, and (v) change existing check stock and business forms.  Because these requirements would force the Debtor to make a number of changes to its Cash Management System, the implementation of these requirements would cause significant and unnecessary disruption in the Debtor's business, thereby impairing its efforts to operate efficiently and pursue opportunities to maximize the value of its estate.

89.     For the foregoing reasons, it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

**C.     Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Priming and Superpriority Post-petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e); and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C); and (IV) Granting Related Relief ("DIP Motion").**

90.     The Debtor needs immediate access to financing. Access to substantial credit is necessary to meet the day-to-day costs associated with operating the Debtor's business and preserving value.  Access to sufficient cash is therefore critical to the Debtor. A loss of confidence among suppliers, customers, employees and other interested parties in the Debtor's ability to access credit at this crucial time would have a material adverse impact on the Debtor's operations and its overall value.

91.     The Debtor engaged in good faith, arm's-length negotiations with Michaelson Capital Special Finance Fund II, L.P. (the "DIP Lender"), leading to the terms and conditions contained in a DIP Credit Agreement (the "DIP Credit Agreement").

92.     The DIP Financing (the "DIP Financing") reflects the exercise of the Debtor's sound and prudent business judgment. As detailed throughout, the Debtor was not able to obtain alternative financing on an unsecured basis, nor was it able to obtain any financing on terms as favorable as the terms negotiated with the DIP Lender. Thus, while there is no pre-petition secured debt, this financing is important to the company and the terms are reasonable in light of the necessity of the additional funding.  In the Debtor's business judgment, the DIP Financing is the best option available for the Debtor to obtain much-needed liquidity in the circumstances of this chapter 11 case.

93.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. The interest rate under the DIP Credit Agreement is within the range of market rates and fair and reasonable in light of the credit profile of the Debtor, the nature and extent of the DIP Collateral (as defined in the DIP Credit Agreement), and the business risks associated with lending to the Debtor in these chapter 11 cases. Because the DIP Credit Agreement has been negotiated in good faith and at arm's-length and no consideration is being provided to any party for obligations arising under the DIP Credit Agreement, other than as disclosed therein, the Debtor requests that the DIP Credit Agreement be accorded the benefits of section 364(e) of the Bankruptcy Code.

94.     The Debtor has exercised sound business judgment in determining that the DIP Financing is not only appropriate, it is necessary. Furthermore, the Debtor has satisfied the legal prerequisites to borrow under the DIP Credit Agreement. The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtor's estate.

95.     Without the liquidity provided by the DIP Credit Agreement, the Debtor may be unable to pay suppliers, employees, and other constituencies that are essential to the operation of

the business in the ordinary course. The Debtor's management has exercised its best business judgment in negotiating the DIP Credit Agreement that is presently before the Court.

96.     For the foregoing reasons, it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the DIP Motion.

**D.    Motion for Order (I) Authorizing Payment of Prepetition Obligations to Critical Vendors Associated with the Debtor's Ongoing Operations, (II) Approving Settlement with Axel Royal, LLC and Axel Americas, LLC, and (III) Granting Related Relief (the "Critical Vendors Motion")**

97.     The Debtor plans to continue operating its business post-petition.  As noted above, the Debtor's nGlide product line generates a significant percentage of its total sales revenue.  All but one of the Critical Vendors supply raw materials that are necessary for the Debtor to be able to continue selling nGlide products to its customers.[8]  For example, Axel Royal serves as the Debtor's primary supplier for the nGlide product line, as described above.  If the Debtor is unable to continue placing orders with Axel Royal, the Debtor will be unable to continue supplying nGlide products to its customers in order to generate sales income.  Similarly, if the Debtor is unable to continue placing orders with the other Critical Vendors, the Debtor will be unable to continue supplying products to its customers in order to generate sales income.  The Debtor cannot easily obtain substitutes for any of the raw materials supplied by the Critical Vendors because even minor changes can materially and adversely affect the performance of the Debtor's products.  In addition, changing some of the raw materials supplied by the Critical Vendors could require the Debtor to seek new approval from its customers who are interested in the raw materials that nGlide comprises, a burdensome process and one that could result in the Debtor's loss of business from those customers.

---

[8]    The remaining Critical Vendor supplies raw materials that are necessary for the Debtor's TuffTek products, which is its second most profitable product line.

98.     <u>Outstanding Prepetition Obligations</u>.  Before the Petition Date, the Debtor ordered various goods and services from its Critical Vendors in the ordinary course of its business operations.  These goods and services were necessary for the Debtor to sell products to its customers and generate profits.  The Debtor's orders resulted in various obligations owed by the Debtor to the Critical Vendors, including the Outstanding Prepetition Obligations.  As set forth in **Exhibit A** to the Critical Vendors Motion, the Outstanding Prepetition Obligations total approximately $200,869.20.  Payment of the Outstanding Prepetition Obligations would benefit the Debtor's estate, creditors, and other parties in interest by permitting the Debtor to continue placing orders with its Critical Vendors in the ordinary course of operating its business.

99.     <u>Post-Petition Obligations</u>.  As described above, the Critical Vendors provide goods and services that are vital to the Debtor's ability to continue selling products to its customers and generating revenue to fund its operations.  Thus, the Debtor will need to place additional orders with the Critical Vendors, which will result in Post-Petition Obligations.  These Post-Petition Obligations be based on post-petition orders and are thus inherently necessary to provide benefits to the estate by allowing the Debtor to continue to generate sales revenue.

100.    <u>Approval of Post-Petition Axel Agreement</u>.  As described in further detail above, the Debtor entered into the Prepetition Axel Agreements before the Petition Date in order to preserve its ability to obtain critical raw materials and continue selling nGlide products to its customers.  Loss of Axel Royal as a supplier would have rendered the Debtor completely unable to continue selling nGlide products to its customers and would have likely forced the Debtor to shut down its operations immediately, drastically reducing its overall value as a going concern.  To ensure that the Debtor will be able to continue operating its business post-petition, the Debtor has negotiated the Post-Petition Axel Agreement with Axel Royal, as further described in the

Critical Vendors Motion and attached as **Exhibit B** thereto.  Because the Post-Petition Axel Agreement will permit the Debtor to continue placing orders with Axel Royal, the Post-Petition Axel Agreement will allow the Debtor to continue selling nGlide products to generate profits. Conversely, without the ability to enter into the Post-Petition Axel Agreement, the Debtor's ability to continue operating its business could be jeopardized, as the Debtor will quickly become unable to fulfill its customers' orders and will have to shut down its operations.  Thus, immediate entry into the Post-Petition Axel Agreement will maximize the value of the Debtor's estate and is therefore in the best interest of creditors and other parties in interest.

101.    For the foregoing reasons, it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Critical Vendors Motion.

**E.      Motion for Entry of an Order Authorizing the Debtor to (I) Pay Prepetition Wages and Other Compensation, and (II) Continue Employee Benefit Programs ("Wages Motion")**

102.    The Debtor employs approximately twenty-four (24) Employees in Houston and Dallas, Texas and Springdale, Arkansas.  None of the Employees are represented by a union or collective bargaining unit.

103.    Wages.  The Debtor pays Wages to its Employees.  ADP administers the Wages and makes disbursements to Employees on Tuesday of each week.  On average, the Debtor pays approximately $74,741.52 in Wages every two-week pay period.

104.    Expense Reimbursements.    The Debtor has historically provided Expense Reimbursements related to, among other things, travel, lodging, ground transportation, meals, and other reasonable and documented business related expenses.  On average, the Debtor has historically paid approximately $6,000 per month on account of Expense Reimbursements.  As of the Petition Date, the Debtor estimates that aggregate Expense Reimbursements of approximately

$2,000 remain outstanding, substantially all of which the Employees incurred through the use of personal funds.

105.    <u>Health and Life Benefits</u>.  The Employees are offered Health and Life Benefits, which are funded in whole or in part by the Debtor, and the remainder of which are funded by Employee contributions.  The Health and Life Benefits are an integral part of the Employees' compensation.  The Health and Life Benefits include: (i) medical care (provided by Blue Cross Blue Shield of Arkansas), dental care (provided by Delta Dental), vision care (provided by Delta Dental), and coverage under COBRA; (ii) employer-paid life insurance (provided by Reliance Standard Life); and (iii) disability insurance (provided by Reliance Standard Life).

106.    <u>401(k) Plan</u>.  The Debtor also provides the Employees an opportunity to participate in the 401(k) Plan, which is administered by ADP.  Approximately twenty-four (24) Employees currently contribute to the 401(k) Plan.  Through contributions withheld from regular payroll, eligible Employees may establish an account as of the first payroll following the date of hire, at which time they may elect to contribute a percentage of their eligible compensation to the 401(k) Plan on a pre-tax basis.  Each Employee's 401(k) Deductions are performed automatically from each paycheck and transferred to a trust established under the 401(k) Plan.  The Debtor makes Matching Contributions of up to four percent of each Employee participant's eligible compensation as well.  The Matching Contributions, which have historically totaled approximately $61,000 per year, are transferred to the 401(k) Plan each pay period.  As of the Petition Date, the Debtor is holding 401(k) Contributions and 401(k) Deductions on behalf of eligible Employees.

107.    The Employees perform a wide variety of functions critical to the Debtor's operations.  Their skills, knowledge, and understanding of the Debtor's operations are essential to preserving operational stability and efficiency.  In many instances, the Employees include highly

trained personnel who could not easily be replaced.  Without the continued, uninterrupted services of its Employees, the Debtor's restructuring efforts will be hampered.  In addition, most Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, the Employees will suffer significant financial hardship if the Debtor is not permitted to continue paying employee compensation, provide benefits, and maintain existing programs.  Indeed, payment of the Employee Compensation and Benefits is the only way to maintain going-concern value, significantly enhancing the Debtor's value for the potential benefit of all parties.

108.    For the foregoing reasons, I believe it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Wages Motion.

**F.      Motion for an Order (I) Authorizing, but not Directing, Payment of Prepetition Sales, Use, Property and Similar Taxes and Fees and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing ("Tax Motion")**

109.    In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business and the sale of products.  The Taxing Authorities are set forth on Exhibit B to the Tax Motion.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtor believes that none of the Taxes and Fees is past due or delinquent

and, after entry of the Proposed Orders, intend to pay such amounts as they come due in the ordinary course of business.

110.    For the foregoing reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other parties in interest that the Court grant the relief requested in the Tax Motion.

### G.    Motion for an Order Providing Adequate Assurance of Utility Payments ("**Utility Motion**")

111.    Numerous Utilities provide the Debtor with traditional utility services, such as telephone and communications, information technology, electricity, and other similar services that are necessary for the continued operation of the Debtor's day-to-day affairs.  Uninterrupted utility service is critical to the Debtor's ability to operate its business and maximize value for the benefit of its creditors.  Loss of utility service would substantially disrupt the Debtor's operations and result in revenue loss, which could irreparably harm the value of the Debtor's estate.

112.    The proposed Adequate Assurance Deposits listed on **Exhibit A** to the Utility Motion, which are calculated based on one-half of the approximation of one month's worth of utility service as calculated by the Debtor according to the last historical 12-month period, are sufficient adequate assurance of the Debtor's future payments to the Utility providers.  As set forth in **Exhibit A** to the Utility Motion, the proposed Adequate Assurance Deposits total $8,401.44.

113.    For the foregoing reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

## IV.    CONCLUSION

114.    The Debtor's immediate objective is to continue to operate its business with as little interruption or disruption as possible to minimize any loss of value during the pendency of the

above-captioned case. If the Court grants the relief requested in the First-Day Pleadings, the prospect for achieving this objective will be substantially enhanced.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 8, 2019
      Houston, Texas

                                    Benjamin Waisbren
                                    Chief Restructuring Officer

**Exhibit 1**

**Outstanding Convertible Notes**
**Outstanding Convertible Notes**

| Holder | Amount | Issuance Date | Maturity Date | Subordination Agreement |
|--------|--------|---------------|---------------|-------------------------|
| Phillip McCluskey | $50,000.00 | June 6, 2017 | June 6, 2018 | Yes |
| Kamlakar P. Rajurkar | $100,000.00 | November 2, 2017 | November 2, 2018 | Yes |
| Rick and Ellen Barrows Revocable Trust | $100,000.00 | November 7, 2017 | November 7, 2018 | No |
| Cornelia C. Jennings[1] | $100,000.00 | December 4, 2017 | December 4, 2018 | Yes |
| Brewster P. Jennings | $100,000.00 | December 13, 2017 | December 13, 2018 | Yes |
| Benjamin W. Wurts | $50,000.00 | December 15, 2017 | December 15, 2018 | Yes |
| Charles A. Brisbane | $100,000.00 | January 3, 2018 | January 3, 2019 | Yes |
| Daniel Carroll | $1,000,000.00 | June 28, 2018 | June 28, 2019 | Yes |
| Waring and Cameron Partridge Foundation | $1,000,000.00 | August 30, 2018 | August 30, 2019 | No |
| Waring and Cameron Partridge Foundation | $1,000,000.00 | September 24, 2018 | September 24, 2019 | No |
| John D. Bertuzzi Revocable Trust | $500,000.00 | November 9, 2018 | November 9, 2019 | No |
| John Acker | $50,000.00 | January 30, 2019 | January 30, 2020 | No |

---

[1]    Ms. Jennings is also the holder of that certain unsecured Promissory Note dated March 6, 2018 with a principal amount of $50,000.00 and an interest rate of 8% per annum, which is payable on demand after August 1, 2018 or when such amounts are declared due and payable by the holder thereof.

## **Exhibit 2**

**Significant Holders of Common Stock**

**Significant Holders of Common Stock**

| Name of Owner | Number of Shares | Approximate Percent Ownership |
|---|---|---|
| Ajay P. Malshe (individually) | 1,275,000 | 20.9% |
| Calvin Goforth | 812,500 | 13.3% |

## **Exhibit 3**

### **Significant Holders of Preferred Stock**

**Significant Holders of Preferred Stock**

| Name of Owner | Series | Number of Shares | Approximate Percent Ownership |
|---|---|---|---|
| PI Asset Holdings, LLC | Preferred A | 552,187 | 39.1% |
| FAF Investments | Preferred A | 404,616 | 28.7% |
| Meadow Lane Investments | Preferred B | 863,480 | 23.6% |
| Advantage Capital | Preferred B | 1,000,000 | 27.3% |
| Hendricks | Preferred B | 937,500 | 25.6% |
| Spring Creek Investments LLC | Preferred B | 375,000 | 10.2% |
| SAEV GUERNSEY Holdings Limited | Preferred C | 3,018,048 | 93.0% |