## **EXHIBIT 1**

**Loan Documents**

**SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT
AND SECURITY AGREEMENT**

Dated as of April [__], 2019

among

**NANOMECH, INC.,**
as the Borrower

**MICHAELSON CAPITAL SPECIAL FINANCE FUND II, L.P.**
as Agent,

and

The Lenders Party Hereto

# Table of Contents

                                                                                      **Page**

Article I DEFINITIONS AND ACCOUNTING TERMS ........................................................... 1

    1.01    Defined Terms ................................................................................................. 1
    1.02    Other Interpretive Provisions........................................................................ 20
    1.03    Accounting Terms .......................................................................................... 21
    1.04    Rounding ........................................................................................................ 21
    1.05    Times of Day .................................................................................................. 21

Article II THE LOANS ............................................................................................................ 21

    2.01    Initial Term Loans and Delayed Draw Term Loans ...................................... 21
    2.02    Borrowings of Loans ..................................................................................... 22
    2.03    Reserved ........................................................................................................ 23
    2.04    Repayment of Loans ...................................................................................... 23
    2.05    Optional Prepayments .................................................................................... 23
    2.06    Reserved ........................................................................................................ 23
    2.07    Reserved ........................................................................................................ 23
    2.08    Interest ........................................................................................................... 24
    2.09    Fees ................................................................................................................ 24
    2.10    Computation of Interest and Fees .................................................................. 24
    2.11    Evidence of Debt ........................................................................................... 24
    2.12    Payments Generally; Agent's Clawback ....................................................... 25
    2.13    Sharing of Payments by Lenders ................................................................... 26
    2.14    Settlement Amongst Lenders.......................................................................... 26
    2.15    Priority and Liens .......................................................................................... 27
    2.16    No Discharge; Survival of Claims ................................................................. 27

Article III INCREASED COSTS ............................................................................................. 27

    3.01    Increased Costs .............................................................................................. 27

Article IV CONDITIONS PRECEDENT TO THE CLOSING DATE ..................................... 28

    4.01    Conditions Precedent to the Occurrence of the Closing Date and to the Making
            of the Initial Term Loans .............................................................................. 28
    4.02    Conditions Precedent to Delayed Draw Term Loans .................................... 31

Article V REPRESENTATIONS AND WARRANTIES .......................................................... 32

    5.01    Existence, Qualification and Power................................................................ 32
    5.02    Authorization; No Contravention .................................................................. 32
    5.03    Governmental Authorization; Other Consents .............................................. 32
    5.04    Binding Effect................................................................................................ 32
    5.05    Financial Statements; No Material Adverse Effect ....................................... 33
    5.06    Litigation ....................................................................................................... 33
    5.07    Ownership of Property; Liens......................................................................... 33
    5.08    Environmental Compliance ........................................................................... 34
    5.09    Insurance........................................................................................................ 34
    5.10    Taxes.............................................................................................................. 35
    5.11    ERISA Event ................................................................................................. 35

5.12     Subsidiaries; Equity Interests ............................................................... 35
5.13     Margin Regulations; Investment Company Act ......................................... 35
5.14     Disclosure ......................................................................................... 35
5.15     Compliance with Laws ......................................................................... 36
5.16     Intellectual Property; Licenses, Etc ...................................................... 36
5.17     Labor Matters .................................................................................... 36
5.18     Security Documents............................................................................. 36
5.19     Orders ............................................................................................... 36
5.20     Brokers ............................................................................................. 36
5.21     Material Contracts .............................................................................. 37
5.22     Foreign Assets Control Regulations, Anti-Money Laundering and Counter-
          Terrorism .......................................................................................... 37
5.23     Foreign Corrupt Practices .................................................................... 37

Article VI AFFIRMATIVE COVENANTS ............................................................... 37

6.02     Certificates; Other Information.............................................................. 37
6.03     Notices .............................................................................................. 38
6.04     Payment of Obligations ....................................................................... 39
6.05     Preservation of Existence, Etc .............................................................. 39
6.06     Maintenance of Properties ................................................................... 39
6.07     Maintenance of Insurance .................................................................... 39
6.08     Compliance with Laws ......................................................................... 40
6.09     Books and Records; Accountants .......................................................... 40
6.10     Inspection Rights ............................................................................... 40
6.11     Use of Proceeds ................................................................................. 40
6.12     Chief Restructuring Officer .................................................................. 40
6.13     Milestones......................................................................................... 41
6.14     Information Regarding the Collateral ..................................................... 42
6.15     Cash Management ............................................................................... 42
6.16     Environmental Laws ........................................................................... 42
6.17     Further Assurances ............................................................................. 42
6.18     Compliance with Terms of Material Leases ............................................ 42
6.19     Material Contracts .............................................................................. 42
6.20     First Day Orders ................................................................................. 43

Article VII NEGATIVE COVENANTS....................................................................... 43

7.01     Liens ................................................................................................. 43
7.02     Investments........................................................................................ 43
7.03     Indebtedness; Disqualified Stock .......................................................... 43
7.04     Fundamental Changes.......................................................................... 43
7.05     Dispositions ....................................................................................... 43
7.06     Restricted Payments ........................................................................... 43
7.07     Prepayments of Indebtedness and Payments of Certain Indebtedness ......... 43
7.08     Change in Nature of Business................................................................ 43
7.09     Transactions with Affiliates................................................................. 43
7.10     Burdensome Agreements...................................................................... 44
7.11     Use of Proceeds ................................................................................. 44
7.12     Amendment of Material Documents ...................................................... 44
7.13     Fiscal Year......................................................................................... 45
7.14     Deposit Accounts................................................................................ 45

7.15     Financial Covenants ................................................................................................ 45

Article VIII EVENTS OF DEFAULT AND REMEDIES ................................................................. 45

8.01     Events of Default ..................................................................................................... 45
8.02     Remedies Upon Event of Default ............................................................................ 49
8.03     Application of Funds ............................................................................................... 49

Article IX THE AGENT ................................................................................................................... 50

9.01     Appointment and Authority ..................................................................................... 50
9.02     Rights as a Lender ................................................................................................... 51
9.03     Exculpatory Provisions ........................................................................................... 51
9.04     Reliance by Agent ................................................................................................... 52
9.05     Delegation of Duties ............................................................................................... 52
9.06     Resignation of Agent .............................................................................................. 52
9.07     Non-Reliance on Agent and Other Lenders ........................................................... 53
9.08     Collateral and Guaranty Matters ............................................................................ 53
9.09     Notice of Transfer ................................................................................................... 54
9.10     Agency for Perfection ............................................................................................. 54
9.11     Indemnification of Agent ........................................................................................ 54
9.12     Relation among Lenders .......................................................................................... 54

Article X MISCELLANEOUS ......................................................................................................... 54

10.01    Amendments, Etc. ................................................................................................... 54
10.02    Notices; Effectiveness; Electronic Communications ............................................. 55
10.03    No Waiver; Cumulative Remedies ......................................................................... 56
10.04    Expenses; Indemnity; Damage Waiver .................................................................. 56
10.05    Payments Set Aside ................................................................................................ 57
10.06    Successors and Assigns ........................................................................................... 58
10.07    Pre-Petition Obligations ......................................................................................... 61
10.08    Right of Setoff ........................................................................................................ 61
10.09    Interest Rate Limitation .......................................................................................... 62
10.10    Counterparts; Integration; Effectiveness ............................................................... 62
10.11    Survival ................................................................................................................... 62
10.12    Severability ............................................................................................................. 62
10.13    Reserved .................................................................................................................. 62
10.14    Governing Law; Jurisdiction; Etc. ......................................................................... 62
10.15    Waiver of Jury Trial ............................................................................................... 64
10.16    No Advisory or Fiduciary Responsibility .............................................................. 64
10.17    USA PATRIOT Act Notice .................................................................................... 64
10.18    Foreign Asset Control Regulations ........................................................................ 65
10.19    Foreign Corrupt Practices Act ................................................................................ 65
10.20    Time of the Essence ................................................................................................ 65
10.21    Additional Waivers ................................................................................................. 65
10.22    No Strict Construction ............................................................................................ 66
10.23    Attachments ............................................................................................................ 66
10.24    Orders Govern ........................................................................................................ 66

Article XI GRANT AND PERFECTION OF SECURITY INTEREST ........................................... 66

11.01    Grant of Security Interest ........................................................................................ 66

11.02    Perfection of Security Interests...................................................................... 68
11.03    Special Provisions Regarding Collateral ..................................................... 71

**SCHEDULES**

Schedule 1.01(P)        Permitted Holders
Schedule 2.01           Commitments and Applicable Percentages
Schedule 5.01           Loan Parties Organizational Information
Schedule 5.08(b)(1)     Owned Real Estate
Schedule 5.08(b)(2)     Leased Real Estate
Schedule 5.13           Subsidiaries; Other Equity Investments
Schedule 5.22           Material Contracts
Schedule 6.03           Material Leases
Schedule 7.01           Existing Liens
Schedule 7.02           Existing Investments
Schedule 7.03           Existing Indebtedness
Schedule 10.02          Agent's Office; Certain Addresses for Notices
Schedule 11.02(d)       Deposit Accounts
Schedule 11.02(e)       Investment Property
Schedule 11.02(f)       Letter of Credit Rights, etc.
Schedule 11.02(g)       Commercial Tort Claims
Schedule 11.02(h)       Third Parties in Possession of Collateral

**EXHIBITS**

Exhibit A        Form of Assignment and Assumption
Exhibit B        Form of Committed Loan Notice
Exhibit C        Form of Compliance Certificate
Exhibit E        Form of Interim Order
Exhibit F        Form of Note

## SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT AND SECURITY AGREEMENT

This **SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT AND SECURITY AGREEMENT** ("Agreement") is entered into as of April [__], 2019 by and among **NANOMECH, INC.**, a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), any Person who from time to time becomes a party hereto as a guarantor after the date hereof (collectively, "Guarantors" and individually, a "Guarantor"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender") and Michaelson Capital Special Finance Fund II, L.P., a Delaware limited partnership ("Michaelson"), as administrative and collateral agent (the "Agent").

WHEREAS, on April 15, 2019 (the "Petition Date"), the Borrower (in such capacity, the "Debtor") filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has applied to the Lenders for a term loan facility in an aggregate principal amount of $850,000;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01**     *Defined Terms*.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not constituting an "account" as defined in the UCC, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, and (iii) any other Person directly or indirectly holding 10% or more of any voting class of the Equity Interests of that Person.

"Agent" means Michaelson, in its capacity as administrative and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent's Office" means the Agent's address and account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Commitments of all the Lenders.  As of the Closing Date, the Aggregate Commitments are $850,000.

"Agreement" means this Senior Secured Debtor-in-Possession Term Credit and Security Agreement, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by the outstanding principal balance of such Lender's Loan at such time to the Total Outstandings at such time.  The Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit A or any other form approved by the Agent.

"Auction" has the meaning specified in Section 6.13.

"Axel" means Axel Royal, LLC.

"Axel Amendment and Consent" means the Amendment to Security Agreement and Open End Credit Agreement and Fourth Amendment to and Limited Consent Under Note Purchase Agreement, dated as of April 4, 2019, by and among the Borrower, Axel and Michaelson, as amended, supplemented or otherwise modified from time to time.

"Axel Collateral" means the "Collateral" (as defined in the Axel Security Agreement as in effect on the date hereof).

"Axel Contract" means any purchase order or other agreement which governs or evidences the goods and services provided or to be provided by Axel to (or for the benefit of) the Borrower.

2

"Axel Credit Agreement" means the Open-End Credit Agreement, dated as of January 28, 2019, by and between the Borrower and Axel, as amended, supplemented or otherwise modified from time to time..

"Axel Loan Documents means the Axel Credit Agreement, the Axel Security Agreement and any other instrument or agreement now or hereafter executed and delivered in connection herewith or therewith.

"Axel Security Agreement" means the Security Agreement, dated as of January 28, 2019, by and between the Borrower and Axel, as amended, supplemented or otherwise modified from time to time.

"Bankruptcy Code" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any appellate court having jurisdiction over the Case from time to time.

"Bid Procedures Order" has the meaning specified in <u>Section 6.13</u>.

"Blocked Accounts" has the meaning specified in <u>Section 6.15</u>.

"Board of Directors" means the board of directors of the Parent.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a borrowing consisting of simultaneous Loans made by each of the Lenders pursuant to <u>Section 2.01</u>.

"Budget" means (i) the weekly statement of cash receipts and cash disbursements of the Debtor for the 13 weeks commencing with the first week following the Petition Date, including (a) individual line items for "Total Cash Disbursements" and "Total Cash Receipts" and (b) the anticipated uses of the DIP Term Loan Facility for such period, in form and substance satisfactory to the Agent, and (ii) all weekly updates thereto (if any) pursuant to the terms of the applicable Order, each in form and substance satisfactory to the Agent, and approved in accordance with the Orders.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning specified in the Interim Order (or, when entered, the Final Order).

"Case" has the meanings assigned to such terms in the preamble.

"Cash and Cash Equivalents" means the Permitted Investments described in clauses (a) through (h) of the definition of Permitted Investments.

"Cash Dominion Event" means, at any time, an Event of Default shall exist or have occurred and be continuing.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall for the purpose of this Agreement, be deemed to be adopted after the Closing Date, regardless of the date enacted, adopted or issued.

"Chapter 11 Plan" means the plan of reorganization of Debtor pursuant to Chapter 11 of the Bankruptcy Code, together with the related disclosure statement.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in Section 11.01, together with all other property that is or is intended under the terms of the Security Documents and the Orders to be subject to Liens in favor of the Agent.

"Commitments" means the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments.  The amount of each Lender's Commitment as of the Closing Date is set forth on Schedule 2.01 and the aggregate amount of the Commitments as of the Closing Date is $850,000 (in each case, before giving effect to the Loans made on the Closing Date and any Delayed Draw Term Funding Date).

"Committed Loan Notice" means a notice of a Borrowing which, if in writing, shall be substantially in the form of Exhibit B.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender's giving the Agent written notice of that Lender's objection to such course of action.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

4

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Case.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the permitted successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, all reasonable and documented out-of-pocket expenses and costs incurred by the Agent and each of the Lenders in connection with this Agreement and the other Loan Documents, including without limitation (a) the reasonable and documented fees and disbursements of (i) counsel for the Agent, (ii) outside consultants for the Agent, (iii) appraisers, and (iv) commercial finance examinations, (b) in connection with (i) the syndication of the credit facilities provided for herein, (ii) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (iii) the enforcement or protection of the rights of the Agent and the Lenders in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce Agent's and the Lenders' rights in the Collateral, or (iv) any workout, restructuring or negotiations in respect of any Obligations, (c) all fees and charges (as adjusted from time to time) of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower or other Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (d) all reasonable out-of-pocket expenses incurred by the Agent in connection with the enforcement or protection of their rights hereunder, including any workout or restructuring of the Obligations after and during the occurrence of an Event of Default.

"CRO" has the meaning specified in <u>Section 6.12</u>.

"Debtor" have the meanings assigned to such terms in the preamble.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means when used with respect to the Loans and the other Obligations, an interest rate equal to the interest rate otherwise applicable to such Loan pursuant to <u>Section 2.08(a)</u> plus 2% per annum.

"Delayed Draw Term Funding Date" means with respect to the Borrowing of any Delayed Draw Term Loans, the date of such Borrowing.

"Delayed Draw Term Loan" has the meaning specified in <u>Section 2.01(b)</u>.

"Delayed Draw Term Loan Commitment" means the commitment of a Lender to make or otherwise fund any Delayed Draw Term Loan pursuant to Section 2.01(b), and "Delayed Draw Term Loan Commitments" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Delayed Draw Term Loan Commitment is set forth opposite such Lender's name on Schedule 2.01, or, if such Lender's Delayed Draw Term Loan Commitment has been assigned, in the applicable Assignment and Assumption Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Delayed Draw Term Commitments as of the Closing Date is $600,000 (before giving effect to the Delayed Draw Term Loans made on any Delayed Draw Term Funding Date).

"DIP Superpriority Claim" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"DIP Term Loan Facility" means the credit facility contemplated by this Agreement.

"Disposition" or "Dispose" means the sale, transfer, exclusive license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests by any Person or the granting of any option or other right to do any of the foregoing (except for the issuance of Equity Interests or grant of any option therein by the Parent)), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (a) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (b) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Parent or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Parent and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, investment fund, mutual fund or company engaged in the business of making commercial loans; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations

under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by the Agent; provided, that, notwithstanding the foregoing, "Eligible Assignee" shall not unless otherwise consented to by the Agent in writing, include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries, or any Permitted Holder, or any holder of Subordinated Indebtedness.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC and to the extent not included therein, all motor vehicles and other rolling stock.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting; provided, that, notwithstanding the foregoing, no Indebtedness shall constitute Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification to the Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a

7

trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the receipt by any Loan party or any ERISA Affiliate of any determination that a Multiemployer Plan is, or is expected to be "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4241 of ERISA).

"Event of Default" has the meaning specified in Section 8.01.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Executive Order" has the meaning set forth in Section 10.18.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to Agent in its reasonable discretion) and authorizing the Delayed Draw Term Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Fiscal Period" means any of the monthly accounting periods of Borrower.

"Fiscal Quarter" means any of the quarterly accounting periods of Borrower.

"Fiscal Year" means the 12 month period of Borrower ending December 31st of each year. Subsequent changes of the fiscal year of Borrower shall not change the term "Fiscal Year" unless Agent shall consent in writing to such change.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality,

regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other Obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness or other obligation to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning. The endorsement of negotiable instruments for collection in the ordinary course of business shall not constitute a "Guarantee".

"Guarantors" has the meaning specified in the introductory paragraph hereto.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, damaged and friable asbestos or asbestos-containing materials, polychlorinated biphenyls (<50 ppm), infectious or medical wastes and all other substances or wastes of any nature regulated as a hazardous material or words of similar effect pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     [reserved];

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than ninety (90) days after the date on which such trade account payable was due and payable);

9

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      All Indebtedness of such Person in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or such Person has no liability therefor as a matter of law.

"Indemnitees" has the meaning specified in Section 10.04(b).

 "Initial Term Loan Commitment" means, as to each Lender, its commitment to make an Initial Term Loan to the Borrower on the Closing Date (before giving effect to the Initial Term Loans made on the Closing Date) pursuant to Section 2.01(a), and "Initial Term Loan Commitments" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is as set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement; provided, that the Initial Term Loan Commitments to make Initial Term Loans on the Closing Date shall not exceed $250,000 (in each case, before giving effect to the Initial Term Loans made on the Closing Date).

"Initial Term Loans" has the meaning specified in Section 2.01(a).

"Intellectual Property" means all of the Loan Parties' right, title and interest in and to all present and future:  trade secrets, confidential know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights; patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source code, object code, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercreditor Provisions" has the meaning specified in Section 8.01(o).

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit E, with changes to such form as are reasonably satisfactory to the Agent in its sole discretion, approving the Loan Documents, which Interim Order shall, among other things (i) have been entered on such prior notice to such parties as may be satisfactory to the Agent in its reasonable discretion, (ii) authorize the extensions of credit in respect of the DIP Term Loan Facility, each in the amounts and on the terms set forth herein, (iii) grant the DIP Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrower of the fees provided for herein.

"Interim Order Entry Date" the date on which the Interim Order is entered by the Bankruptcy Court.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person in any other Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in any other Person. For purposes of covenant compliance, the amount of any outstanding Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment net of any repayments thereof. For the avoidance of doubt, the acquisition or construction of fixed or capital assets by a Loan Party or any Subsidiary that is a Loan Party shall not constitute an Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of Real Estate or any other space in a structure, land, improvements or premises for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security

interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, the Security Documents, Intercreditor Provisions, the Orders, and  any other instrument or agreement now or hereafter executed and delivered in connection herewith  or therewith.

"Loan Parties" means the Borrower and any Guarantor.

"Loans" means the Initial Term Loans and the Delayed Draw Term Loans.

"Material Adverse Effect" means any (a) event or circumstance that has had or is reasonably likely to have a material adverse effect on the business, financial condition or results of operations of the Borrower since December 31, 2018, but excluding any matters publicly disclosed prior to the filing of the Case and excluding the effect of the filing of the Case or the circumstances and events leading up thereto; (b) a material impairment of the ability of the Borrower to perform its obligations under the Loan Documents; (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or with respect to any of the Collateral, or (d) a material adverse effect on the Agent's Liens (on behalf of itself and Lenders) on the Collateral or the priority of such Liens.

"Material Contract" means, with respect to any Person, (i) the Axel Contract and (ii) each other contract to which such Person is a party the termination of which could be reasonably expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $50,000, and at all times shall include the Indebtedness outstanding under the Prepetition Note Purchase Facility and the Axel Credit Agreement.

"Material Leases" means any of the Leases set forth on Schedule 6.03.

"Maturity Date" means the earliest of (a) the Scheduled Maturity Date, (b) the date which is 30 days following the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the acceleration of the Loans and the termination of the Commitments pursuant to Section 8.02, (d) the date of the consummation of a sale, that when taken with all previously consummated sales, effects the sale of all or substantially all of the Debtor's assets, (e) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a Chapter 11 Plan, and (f) the date of confirmation of a plan of liquidation for Borrower in the Case.

"Maximum Rate" has the meaning specified in Section 10.09.

"Measurement Period" means (a) the one week period beginning on the Monday following the first full week after the Petition Date and ending on the first Sunday occurring thereafter, (b) the two week period beginning on the Monday following the first full week after the Petition Date and ending on the second Sunday occurring thereafter, (c) the three week beginning on the Monday following the first full week after the Petition Date and ending on the third Sunday occurring thereafter , (d) the four week

12

period beginning on the Monday following the first full week after the Petition Date and ending on the fourth Sunday occurring thereafter, and (e) each four week period ending on the most recently ended Sunday thereafter; it being understood that each Measurement Period shall begin on a Monday and end on a Sunday.

"Michaelson" has the meaning specified in the introductory paragraph of this Agreement.

"Milestones" has the meaning specified in Section 6.13.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Parent or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing the Loan made by such Lender, substantially in the form of Exhibit F as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all Loans, advances to, and debts (including principal, interest, fees, costs, and expenses, liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor)), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any of its Subsidiaries thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest ,fees, costs, expenses and indemnities are allowed claims in such proceeding.  For the avoidance of doubt, the Obligations shall include that portion of the outstanding Prepetition Note Purchase Obligations, which have been "rolled-up" from time to time as provided in the Orders.

"Orders" means collectively, the Interim Order and the Final Order.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Parent" means the Borrower.

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning specified in Section 10.06(d).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Parent, any Loan Party, or any ERISA Affiliate, to which the Parent, any Loan Party, or any ERISA Affiliate contributes or has an obligation to contribute, or for which the Parent, any Loan Party or any ERISA Affiliate has any liability or contingent liability.

"Permitted Disposition" means any of the following:

(a)       Dispositions of Inventory in the ordinary course of business;

(b)       Dispositions of Equipment in the ordinary course of business that is substantially worn-out, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary; and

(c)       the consummation of the Sale; provided, that, the proceeds from the Sale shall, subject to the Orders, be applied to repay the Obligations in accordance with the terms hereof.

"Permitted Encumbrances" means:

(a)       Liens imposed by law for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in compliance with Section 6.04, (ii) pre-petition Taxes to the extent the payment thereof is stayed by reason of the Case, the applicable Orders, or other applicable Bankruptcy Court orders, and (iii) post-petition Taxes that are not yet due and payable;

(b)       pledges or deposits of money securing obligations under worker's compensation, unemployment insurance, social security or public liability laws or similar legislation;

(c)       pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business;

(d)       deposits of money securing public or statutory obligations of any Loan Party;

(e)       inchoate and unperfected workers', mechanics', or similar liens arising in the ordinary course of business so long as such Liens attach only to Equipment, fixtures or real estate;

(f)       carriers', warehousemen's', suppliers' or other similar possessory liens arising in the ordinary course of business and securing indebtedness not yet due and payable, so long as such Liens attach only to Inventory;

(g)       deposits of money securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party;

14

(h)    zoning restrictions, easements, licenses, or other restrictions on the use of real property or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such real estate;

(i)    Purchase Money Liens securing Purchase Money Indebtedness permitted under clause (f)(i) of the definition of Permitted Indebtedness. Liens on fixed or capital assets of any Loan Party securing Indebtedness that are so long as such Liens do not extend to any other property or assets of the Loan Parties;

(j)    Liens existing on the Closing Date and listed on Schedule 7.01 and which are not otherwise provided for by any other clauses of this definition;

(k)    Liens in favor of the Agent to secure the Obligations and Liens pursuant to the Orders;

(l)    Liens in favor of Axel on the Axel Collateral which secure Indebtedness permitted under clause (b) of the definition of Permitted Indebtedness; provided, that, such Liens shall be subject to the terms of the Axel Amendment and Consent and the applicable Order; and

(m)    silent Liens securing the Indebtedness permitted by clause (f)(ii) of the definition of Permitted Indebtedness; provided, that, Agent shall have received an intercreditor agreement, in form and substance satisfactory to the Agent, duly executed and delivered by the holder of such Lien and duly acknowledged by the Borrower.

"Permitted Holder" means the persons listed on Schedule 1.01(P) hereto.

"Permitted Indebtedness" means each of the following:

(a)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03 and which is not otherwise provided for by any other clause of this definition;

(b)    Indebtedness of the Borrower to Axel pursuant to the Axel Credit Agreement; provided, that, the outstanding principal amount of such Indebtedness shall not exceed $750,000 at any time;

(c)    Indebtedness consisting of deferred taxes;

(d)    Indebtedness arising by endorsement of Instruments or items of payment for deposit to the general account of Borrower;

(e)    guarantees of Indebtedness incurred for the benefit of Borrower if such Indebtedness is permitted by this Agreement; and

(f)    (i) Purchase Money Indebtedness and (ii) other Indebtedness; provided, that, the aggregate outstanding amount of the Indebtedness under clauses (i) and (ii) shall not exceed $200,000 at any time.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)     commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(d)     Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the principal amount thereof or any other modification of the terms thereof;

(e)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business; and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss in each case in the ordinary course of business;

(f)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(g)     loans or advances to the Borrower in the ordinary course of business in an amount not to exceed $50,000 at any time outstanding.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meanings assigned to such term in the preamble.

"Prepetition Note Purchase Agreement" means the certain Note Purchase and Security Agreement, dated as of April 10, 2018, among the Borrower, the Prepetition Note Purchasers and the Prepetition Note Purchase Collateral Agent, as heretofore amended, modified, supplemented, extended, renewed, restated or replaced.

"Prepetition Note Purchase Collateral" means the (i) "Collateral" as defined in the Prepetition Note Purchase Documents and (ii) any other security for the Prepetition Note Purchase Obligations as provided in any of the Prepetition Note Purchase Documents.

"Prepetition Note Purchase Collateral Agent" means the "Collateral Agent" as defined in the Prepetition Note Purchase Documents.

"Prepetition Note Purchase Facility" means the credit facility made available pursuant to the Prepetition Note Purchase Agreement.

"Prepetition Note Purchase Documents" means the Prepetition Note Purchase Agreement and the other "NPA Documents" as defined in the Prepetition Note Purchase Agreement.

"Prepetition Note Purchase Obligations" means the Obligations (as defined in the Prepetition Note Purchase Agreement) arising at any time before the Petition Date.

"Prepetition Note Purchasers" means Michaelson, Southeast Community Development Fund II, L.P., a Delaware limited Partnership, Advantage Capital Community Development Fund, L.L.C., a Louisiana limited liability company, and CDVAC SUB-CDE IV, LLC, a Delaware limited liability company.

"Purchase Money Indebtedness" means (a) any Indebtedness incurred for the payment of all or any part of the purchase price of any fixed asset, (b) any Indebtedness incurred for the sole purpose of financing or refinancing all or any part of the purchase price of any fixed asset, and (c) any renewals, extensions or refinancings thereof (but not any increases in the principal amounts thereof outstanding at that time).

"Purchase Money Lien" means any Lien upon any fixed assets and the proceeds thereof which secures the Purchase Money Indebtedness related thereto but only if such Lien shall at all times be confined solely to the asset the purchase price of which was financed or refinanced through the incurrence of the Purchase Money Indebtedness secured by such Lien, and the proceeds of such asset, and only if such Lien secures only such Purchase Money Indebtedness.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables" shall mean all of the following now owned or hereafter arising or acquired property of each Loan Party: (a) all Accounts; (b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (c) all payment intangibles of such Loan Party; (d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to any Loan Party or otherwise in favor of or delivered to any Loan Party in connection with any Account; or (e) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to any Loan Party, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other general intangibles), rendition of services or from loans or advances by any Loan Party or to or for the benefit of any third person (including loans or advances to any Affiliates or Subsidiaries of any Loan Party) or otherwise associated with any Accounts, Inventory or general intangibles of any Loan Party (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to any Loan Party in connection with the termination of any Person, Plan or Multiemployer Plan or other employee benefit plan and any other amounts payable to any Loan Party from any Person, Plan or Multiemployer Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which any Loan Party is a beneficiary).

"Records" shall mean, as to each Loan Party, all of such Loan Party's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and

other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of any Loan Party with respect to the foregoing maintained with or by any other person).

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reorganization Plan" means a liquidation plan or plan of reorganization in the Case of the Debtor.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the sum of (a) the Total Outstandings, and (b) the unused Aggregate Commitments.

"Responsible Officer" means the chief executive officer, chief restructuring officer, president, senior vice-president, vice-president, chief financial officer, treasurer or assistant treasurer of the Borrower.  Any document delivered hereunder that is signed by a Responsible Officer shall be conclusively presumed to have been authorized by all necessary corporate action on the part of the Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale" has the meaning specified in Section 6.13.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"Scheduled Maturity Date" means July 5, 2019 (or if not a Business Day, the next Business Day).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC.

"Security Agreement" means the provisions set forth in Article XI of this Agreement, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, shareholders' equity of the Borrower as of that date determined in accordance with GAAP.

"Specified D&O Policy" means, individually and collectively, (a) the business and management indemnity policy issued by Scottsdale Indemnity Company bearing policy number EKI3226169 or policy number EK13226169, (b) the directors and officers liability policy issued by Argonaut Insurance Company bearing policy number MLX7601199-4 and (c) any other directors and officers liability policy issued from time to time which names the Borrower as a named insured or beneficiary, in each case as the same now exists or may hereafter be renewed, replaced, extended, amended, supplemented or otherwise modified from time, together with any endorsements or supplements thereto.

"Stalking Horse APA" has the meaning specified in Section 6.13.

"Stalking Horse Bidder" has the meaning specified in Section 6.13

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Outstandings" means the aggregate outstanding principal amount of all Loans.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the

Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unaudited Financial Statements" means the unaudited balance sheet of the Parent for the Fiscal Year ended December 31, 2018, and the related statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent, including the notes thereto.

"United States" and "U.S." mean the United States of America.

"Variance Report" mean a variance report on a weekly basis setting forth (1) actual cash receipts and actual cash disbursements for the Measurement Period then most-recently ended, (2) all variances, on an aggregate basis, as compared to the Budget for such Measurement Period, and (3) an explanation, in reasonable detail, for any material variance, certified by a Responsible Officer of the Parent.

    **1.02**    *Other Interpretive Provisions*.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

    (a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

    (b)    In the computation of periods of time from a specified date to a later specified date, unless otherwise expressly provided, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

    (c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds or other collateral as may be requested by the Agent of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03**   *Accounting Terms*.

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP and without including the effect of any changes to lease accounting that requires the assets and liabilities arising under operating leases to be recognized in any statement of financial position.  Notwithstanding the foregoing, financial calculations under this Agreement shall be computed to exclude any change to lease accounting rules from those in effect pursuant to Financial Account Standards Board Account Standards Codification 840 (Leases) and other related lease account guidance as in effect on the Closing Date.

**1.04**   *Rounding*.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05**   *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II
## THE LOANS

**2.01**   *Initial Term Loans and Delayed Draw Term Loans*.

(a)    <u>Initial Term Loans</u>.  Each Lender having an Initial Term Loan Commitment agrees, severally and not jointly, subject to the terms and conditions set forth herein, to make on the Closing Date, subject to satisfaction (or waiver by all such Lenders having Initial Term Loan Commitments identified on <u>Schedule 2.01</u>) of the conditions precedent set forth in <u>Section 4.01</u>, term loans to the Borrower in a principal amount equal to such Lender's Initial Term Loan Commitment (each such loan being referred to herein as an "Initial Term Loan").  Once repaid, whether such repayment is voluntary or required, no portion of the Initial Term Loans may be reborrowed.

21

(b)      Delayed Draw Term Loans.  Each Lender having a Delayed Draw Term Loan Commitment agrees, severally and not jointly to make, subject to satisfaction (or waiver by all such Lenders having Delayed Draw Term Loan Commitments) of the conditions precedent set forth in Section 4.02 and in accordance with the procedures in Section 2.02, upon written request by the Borrower after the entry of the Final Order, on no more than two (2) occasions (or such additional number of occasions as may be agreed upon by the Agent in its sole discretion), term loans to the Borrower in a principal amount not to exceed the unused and unfunded portion of such Lender's Delayed Draw Term Loan Commitment (collectively, the "Delayed Draw Term Loans").  Once repaid, whether such repayment is voluntary or required, no portion of the Delayed Draw Term Loans may be reborrowed.

(c)      Each Lender shall make each Loan to be made by it hereunder on the Closing Date the applicable Delayed Draw Term Funding Date, as the case may be, by wire transfer of immediately available funds by 2:00 p.m., New York, New York time, to the account of the Agent most recently designated by it for such purpose by notice to the Lenders. Upon satisfaction of the applicable conditions set forth in Section 4.01 or 4.02, as applicable, the Agent will make each such Loan(s) available to the Borrower by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower.  The failure of any Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(d)      Unless the Agent shall have received notice from a Lender prior to the proposed date of any Loan to be made by such Lender that such Lender will not make available to the Agent such Lender's share of such borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its Loan available to the Agent, then such Lender and the Borrower jointly and severally agree to pay to the Agent forthwith on written demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (i) in the case of any Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate set forth in Section 2.08(a) hereof.

(e)      The aggregate Initial Term Loan Commitments shall be automatically and permanently reduced to zero on the date of the Borrowing of the Initial Term Loans.  The aggregate Delayed Draw Term Loan Commitments shall be automatically and permanently reduced on each Delayed Draw Term Funding Date by an amount equal to the aggregate principal amount of the Delayed Draw Term Loans borrowed on such Delayed Draw Term Funding Date.

(f)      During the period after the Closing Date but prior to the Maturity Date, the Borrower may, upon notice to the Agent, from time to time terminate (in whole or in part) the unused portion of the aggregate Delayed Draw Term Loan Commitments; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in a minimum amount of $50,000 or any whole multiple of $50,000 in excess thereof.

(g)      The Delayed Draw Term Loans and Initial Term Loans shall constitute a single class of Loans for all purposes of this Agreement and the other Loan Documents.

**2.02**      *Borrowings of Loans*.

(a)      Each Borrowing of Loans shall be made upon the Borrower's irrevocable notice to the Agent, which may be given by telephone.  Each such notice must be received by the Agent not later than 11:00 a.m. (i) on the Business Day of the Borrowing of the Initial Term Loans, and (ii) three Business Days prior to the requested date of the Borrowing of Delayed Draw Term Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrower.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.

(b)      Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans.

(c)      Each Borrowing of Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentages in respect of the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments.

(d)      The Agent, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account.  The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Loans.

**2.03**      *Reserved.*

**2.04**      *Repayment of Loans*.  The Borrower shall repay to the Agent, for the account of each Lender, the aggregate principal amount of all Loans outstanding on the Maturity Date.

**2.05**      *Optional Prepayments*.  The Borrower may, upon irrevocable notice from the Borrower to the Agent, at any time or from time to time voluntarily prepay Loans in whole or in part, plus all amounts due under Section 2.08(c); provided, that, (i) such notice must be received by the Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment, and (ii) any prepayment shall be in a principal amount of at least $50,000 or a whole multiple of $50,000 in excess thereof; in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.  Any notice delivered pursuant to this Section 2.05 in connection with a refinancing of this Agreement may state that such notice is conditioned upon the effectiveness of the other credit facility or receipt of proceeds from the issuance of new Indebtedness comprising such replacement financing, in which case such notice may be revoked (by written notice to Agent on or prior to the specified effective date of termination) if such effectiveness does not occur.

**2.06**      *Reserved.*

**2.07**      *Reserved.*

**2.08**    *Interest*.

(a)    Subject to the provisions of <u>Section 2.08(b)</u>, the Loans and the other Obligations shall bear interest on the outstanding principal amount thereof at a fixed rate per annum equal to 15% from the date any Loan is advanced or the Obligation is incurred or payable, until paid by Borrower.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fixed interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fixed interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month beginning May 1, 2019; (ii) on any date of any prepayment, with respect to the principal amount of the Loan being prepaid; and (iii) on the Maturity Date.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand, in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09**    *Fees*.  The Borrower shall pay to Agent, for the account of each Lender in accordance with its Applicable Percentage, a closing fee (the "<u>Closing Fee</u>") in an amount equal to $50,000, which shall be due and payable on the Closing Date.  Such Closing Fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.  The Agent is irrevocably authorized to charge the amount of the Closing Fee against the loan account for the Initial Term Loans maintained by the Agent, it being agreed that the Agent is irrevocably authorized to hold back $50,000 from the proceeds of the Initial Term Loans otherwise remitted to the Borrower and apply such $50,000 to pay the Closing Fee to the Agent.

**2.10**    *Computation of Interest and Fees*.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on the day such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12(a)</u>, bear interest for one day.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11**    *Evidence of Debt*.

(a)    The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "<u>Loan Account</u>") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent

manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

**2.12**    *Payments Generally; Agent's Clawback.*

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any taxes, counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  Subject to Section 2.14 hereof, the Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.  A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(b) shall be conclusive, absent manifest error.

(c)    Except for payments and other amounts received by Agent and applied in accordance with the provisions of Section 8.03, all payments and any other amounts received by the Agent from or for the benefit of the Borrower shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loan the Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Agent has not then been reimbursed by such Lender or the Borrower, second, to pay all other Obligations then due and payable and third, as the Borrower shall so designate.  Except as otherwise expressly provided for herein, payments in respect of the Loans received by the Agent shall be distributed to each Lender in accordance with such Lender's pro rata share of the Loans; and all payments of fees and all other payments in respect of any other Obligation

25

shall be allocated among such of the Lenders as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Applicable Percentages. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, Agent shall, to the extent authorized by the Orders, apply any such payments or amounts first, to the Prepetition Note Purchase Obligations in accordance with the terms of the Prepetition Note Purchase Agreement and the Orders until such Prepetition Note Purchase Obligations are paid and satisfied in full and second, to the Obligations in accordance with the terms of this Agreement and the Orders until the Obligations are paid and satisfied in full.

2.13    *Sharing of Payments by Lenders*. If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14    *Settlement Amongst Lenders*.

(a)    The amount of each Lender's Applicable Percentage of outstanding Loans shall be computed each time a payment is made by Borrower (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the receipt by Agent of any such payment. Interest shall cease to accrue on the portion of any Loan paid on the date such payment is made to Agent regardless of the Settlement Date.

(b)    The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, and subject to Section 8.03, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Loans outstanding as of such

Settlement Date. If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15**    *Priority and Liens*.

(a)    The Borrower hereby covenants and agrees that upon the entry of, and subject to the terms and provisions of, the Interim Order (and when applicable, the Final Order):

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations shall at all times constitute an allowed DIP Superpriority Claim in the Case, subject only to the Carve-Out; and

(ii)    pursuant to Section 364 of the Bankruptcy Code, the Obligations shall at all times be secured by valid, binding, continuing, enforceable perfected Liens with respect to the Collateral, all as set forth, and with the priority specified, in the Interim Order (and, when entered, the Final Order).

(b)    All of the Liens described in this Section 2.15 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Agent of, or over, any Collateral, as set forth in the Interim Order.

(c)    Notwithstanding anything to the contrary herein, each Loan Party will cause all equity interests of each of its Subsidiaries and all of its tangible and intangible personal property, Real Estate and other assets in each case now owned or hereafter acquired by it to be subject at all times to a Lien in favor of the Agent, for the benefit of the Lenders, securing the Obligations, excluding any asset the granting of a security interest in which would be void or illegal under any applicable law, or pursuant thereto would result in, or permit the termination, invalidation, cancellation, loss or abandonment of, such asset).

**2.16**    *No Discharge; Survival of Claims.*  The Borrower agrees that to the extent that its obligations under the Loan Documents have not been satisfied in full in cash, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the DIP Superpriority Claim granted to the Agent and the Lenders pursuant to the Orders and the Liens granted to the Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

**ARTICLE III**
**INCREASED COSTS**

**3.01**    *Increased Costs*.

27

(a)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(b)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(c)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(d)    All of the Obligations under this Section 3.01 shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO THE CLOSING DATE

**4.01**    *Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans*.  The occurrence of the Closing Date, and the obligation of each Lender to make Initial Term Loans on the Closing Date is subject to the fulfillment (or waiver in accordance with Section 10.01), to the satisfaction of the Agent and each Lender, of each of the following conditions precedent:

(a)    The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Agent:

(i)    executed counterparts of this Agreement;

(ii)    Notes executed by the Borrower in favor of each Lender requesting a Note;

(iii)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)     copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     a certificate signed by a Responsible Officer of the Borrower certifying (A) that the representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, are (1) with respect to representations and warranties that contain a materiality qualification,  true and correct immediately prior to, and after giving effect to, the funding on the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (2) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects immediately prior to, and after giving effect to, the funding on the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (B) no Default or Event of Default shall exist or would result from the making of the Loans, (C) [reserved], (D) [reserved], and (E) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vi)     evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(vii)     [reserved];

(viii)     all other Loan Documents, each duly executed by the Borrower;

(ix)     properly completed UCC Financing Statements (and including amendments and assignments with respect thereto, if applicable) in form and number sufficient under the UCC of all jurisdictions that Agent may deem necessary or desirable in order to perfect or continue the perfection of Agent's liens, together with any filings in the United States Patent and Trademark Office and United States Copyright Office as the Agent may deem necessary or desirable, and instruments shall have been so filed, registered or recorded to the satisfaction of Agent;;

(x)     results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of

Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made; and all filing and recording fees shall have been duly paid; and

(xi)    the Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(b)    (i)  The Debtor has commenced the Case in the Bankruptcy Court, (ii) the Bankruptcy Court shall have entered the Interim Order, in form and substance reasonably satisfactory to the Agent, approving the DIP Term Loan Facility and the transactions contemplated hereby, including without limitation, the granting of superpriority status, security interests and Liens as contemplated by the Interim Order and the Loan Documents, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent, and (iii) all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Interim Order, the DIP Term Loan Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Agent.

(c)    There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(d)    The Agent shall have received the initial Budget, in form and substance acceptable to the Agent.

(e)    The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document, and shall not have been enjoined, whether temporarily, preliminary or permanently.

(f)    All fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(g)    The Borrower shall have paid all fees, charges and disbursements of counsel to the Agent and to Michaelson to the extent invoiced prior to or on the Closing Date.

(h)    The Agent and the Lenders shall have received prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act,  to the extent requested in writing prior to the Closing Date, the results of which are satisfactory to the Agent.

(i)    The Agent shall, upon the entry of the Interim Order, have valid and perfected Liens on and security interests in the Collateral with the priority described in the Interim Order.

(j)    All pleadings filed by the Debtor that could reasonably be expected to affect the DIP Term Loan Facility, the Collateral or the rights or remedies of the Agent shall be of the types to be agreed, and all orders entered by the Bankruptcy Court (including, without limitation, the Interim Order) shall be in form and substance reasonably satisfactory to the Agent.

Without limiting the generality of the provisions of <u>Section 9.04</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02** *Conditions Precedent to Delayed Draw Term Loans.*  No Lender shall be required to make any Delayed Draw Term Loan unless and until the following conditions are satisfied:

(a)    At the time of and immediately after giving effect to such Delayed Draw Term Loan, no Default or Event of Default shall exist or would result from the making of the Delayed Draw Term Loans.

(b)    The representations and warranties of each Loan Party set forth in the Loan Documents shall (1) with respect to representations and warranties that contain a materiality qualification, be true and correct immediately prior to, and after giving effect to, the funding of such Delayed Draw Term Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (2) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects immediately prior to, and after giving effect to, the funding of such Delayed Draw Term Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

(c)    The Agent shall have received a Committed Loan Notice in accordance with the requirements hereof executed and delivered by the Borrower to Agent regarding such Delayed Draw Term Loans.

(d)    The Final Order Entry Date shall have occurred, and the Final Order shall be in full force and effect, in form and substance reasonably satisfactory to the Agent, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Agent in its sole discretion, and shall not be subject to a stay, and the Agent shall have received a signed copy of the Final Order entered by the Bankruptcy Court.

(e)    The making of such Delayed Draw Term Loan shall not violate any applicable Law or any Organization Document of any Loan Party, and shall not be enjoined, temporarily, preliminary or permanently.

(f)    The Loan Parties shall have achieved the Milestones on or prior to the corresponding dates set forth in <u>Section 6.13</u>, to the extent such dates fall on or before the date of the Borrowing of such Delayed Draw Term Loans.

(g)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

The Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.02</u> have been satisfied on and as of the date of the Borrowing of the Delayed Draw Term Loans.

Without limiting the generality of the provisions of <u>Section 9.04</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.02</u>, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the applicable Delayed Draw Term Funding Date specifying its objection thereto.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make the Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01**    *Existence, Qualification and Power*.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) subject to the entry of the Orders and subject to the terms thereof, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02**    *Authorization; No Contravention*.  Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03**    *Governmental Authorization; Other Consents*.  Subject to the entry of the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document to which such Person is a party, except for such as have been obtained or made and are in full force and effect.

**5.04**    *Binding Effect*.  Subject to the entry of the Orders, this Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to

32

applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05** *Financial Statements; No Material Adverse Effect.*

(a)     The Unaudited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Parent as of the date thereof and its results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) to the extent required by GAAP, show all Material Indebtedness.

(b)     [Reserved].

(c)     [Reserved].

**5.06** *Litigation.*   There are no unstayed actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.07** *Ownership of Property; Liens.*

(a)     Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in all Real Estate necessary or used in the ordinary conduct of its business, except for Permitted Encumbrances.  Each of the Loan Parties and each of its Subsidiaries has good title to, valid licenses or service agreements to use all personal property material to the ordinary conduct of its business, except in each case as does not have and would not reasonably be expected to have a Material Adverse Effect.  Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries.

(b)     Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties.  Except as otherwise expressly permitted by Section 6.18, each of the Material Leases are in full force and effect, the Loan Parties and their Subsidiaries are not in default (beyond applicable cure periods) of the terms of any such Leases (including with respect to the payment of rent or other amounts due thereunder) and each of the Loan Parties and their Subsidiaries enjoys peaceful and undisturbed possession under all such Leases.  Each Lease (other than any Material Lease) is in full force and effect, the Loan Parties and their Subsidiaries are not in default (beyond applicable cure periods) of the terms of any such Leases and each of the Loan Parties and their Subsidiaries enjoys peaceful and undisturbed possession under all such Leases, except, in each case, as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     [reserved].

(d)     Schedule 7.01 sets forth a complete and accurate list of all Liens (other than Permitted Encumbrances described in clause (a) through (g) of the definition thereof) on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder

thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(e)    Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(f)    Schedule 7.03 sets forth a complete and accurate list of all Indebtedness (other than Permitted Indebtedness described in clauses (b) through (f) of the definition thereof) (other than the Obligations) of each Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of, and after giving effect to the occurrence, the Closing Date the amount, obligor or issuer and maturity thereof.

**5.08**    *Environmental Compliance*.

(a)    No Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    None of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or, to the knowledge of any Loan Party, is adjacent to any such property; (ii) there are no and to the knowledge of any Loan Party never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; (iii) there is no damaged or friable asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, except, in each case of (i) through (iv), as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    (i) No Loan Party or any Subsidiary thereof is undertaking, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except, in each case, as could not individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (ii) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability under applicable Environmental Law to any Loan Party or any Subsidiary thereof.

**5.09**    *Insurance*.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's

compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. The Specified D&O Policy names the Borrower as the named insured and is in full force and effect.

**5.10** *Taxes*. The Loan Parties and their Subsidiaries have filed all Federal, material state and other material tax returns and, subject to any restrictions by reason of the Case, the applicable Orders or any other applicable Bankruptcy Court order, reports required to be filed by them, and have paid all Federal, material state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed (other than Liens for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in compliance with <u>Section 6.04</u>, (ii) pre-petition Taxes to the extent the payment thereof is stayed by reason of the Case, the applicable Bankruptcy Court order, and (iii) post-petition Taxes that are not yet due and payable) and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.11** *ERISA Event*. No ERISA Event has occurred or is reasonably expected to occur;

**5.12** *Subsidiaries; Equity Interests*. The Borrower has no Subsidiaries and own no Equity Interests other than those specifically disclosed in Part (a) of <u>Schedule 5.13</u>, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.

**5.13** *Margin Regulations; Investment Company Act*.

(a)      No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Loans shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)      None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.14** *Disclosure*. Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (excluding projected financial information, forward-looking statements and general industry or general economic data) (in each case, as modified or supplemented by other information so furnished) taken as whole contains any material misstatement of fact or omits to state any material fact necessary to make the

35

statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that projections by their nature are inherently uncertain and that, even though the projections are prepared in good faith on the basis of assumptions believed to be reasonable at the time such projections were prepared, the results reflected in the projections may not be achieved and actual results may differ and such differences may be material).

5.15    *Compliance with Laws*.  Each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.16    *Intellectual Property; Licenses, Etc*.  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are material to and reasonably necessary for the operation of their respective businesses, without, to the best knowledge of the Loan Parties, conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary and material to it (or reasonably expected to be material to it, if now contemplated to be employed) infringes upon any rights held by any other Person.  No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.17    *Labor Matters*.  Except as could not reasonably be expected to have a Material Adverse Effect, there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened.

5.18    *Security Documents*.

(a)    Subject to the entry of the Orders, the Security Agreement creates in favor of the Agent, for the benefit of the Lenders, a legal, valid, continuing and enforceable security interest in the Collateral, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and such security interest has the priority set forth in the applicable Order.

(b)    [reserved].

5.19    *Orders*.  The Interim Order (and, following the expiration of the Interim Financing Period defined therein, the Final Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay.

5.20    *Brokers*.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.21**    *Material Contracts*.  Schedule 5.22 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract.

**5.22**    *Foreign Assets Control Regulations, Anti-Money Laundering and Counter-Terrorism*. No Loan Party or its Subsidiaries, nor to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of any Loan Party or Subsidiary is currently subject to any U.S. sanctions administered by OFAC; and Loan Parties will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person for the purpose of financing the activities of any Person currently subject to any U.S. sanctions laws administered and enforced by OFAC.

**5.23**    *Foreign Corrupt Practices*.  To the extent applicable, each Loan Party and its respective Subsidiaries is in compliance, with the (a) Trading With the Enemy Act, and the Foreign Assets Control Regulations, and (b) PATRIOT Act.  No part of the proceeds of the Loans will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity for or on behalf of a foreign government, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted) or any Commitment shall exist, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.02 and 6.03) cause each Subsidiary to:

(a)    [reserved].

**6.02**    *Certificates; Other Information*.  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)    no later than 5:00 p.m. on Wednesday of each calendar week, an updated Budget and a Variance Report;

(b)    within thirty (30) days after the end of each Fiscal Period, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(c)    weekly status updates to the Agent as to the sale process, in form and detail reasonably satisfactory to the Agent;

(d)    promptly upon receipt, copies of any "final" detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them;

(e)    promptly after the Agent's reasonable request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness; and

(f)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

**6.03**    *Notices*.  Promptly notify the Agent:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of any breach or non-performance of, or any default under, a Material Contract by any Loan Party or any Subsidiary thereof;

(d)    of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws, in each such case which could reasonably be expected to have a Material Adverse Effect;

(e)    of the occurrence of any ERISA Event;

(f)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)    of any change in any Loan Party's senior executive officers;

(h)    of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)    of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)    of the filing of any Lien for unpaid Taxes against any Loan Party;

(k)    of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)    the filing or commencement of any material action, suit or proceeding with respect to any Material Lease;

(m)    the receipt by any Loan Party of any written notice from any lessor of such lessor's intention to terminate any Material Lease, together with a copy of all such written notices of intended termination from the lessors thereunder; and

(n)    the amendment, or any other modification of any Material Contract or the entry into or of any supply contract constituting a Material Contract to which a Loan Party is or becomes a party.

38

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04**    *Payment of Obligations*.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.05**    *Preservation of Existence, Etc*.

(a)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization or formation; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property (i) is no longer used or useful in the conduct of the business of the Loan Parties or (ii) is not otherwise material  to the business of any Loan Party or any of its Subsidiaries in any respect.

**6.06**    *Maintenance of Properties*.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07**    *Maintenance of Insurance*.

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent and, in any event, the Agent shall be named as a loss payee under property insurance and an additional insured under liability insurance.

(b)    Maintain the Specified D&O Policy in full force and effect at all times, and not amend, waive, supplement or otherwise modify the Specified D&O Policy without the prior written consent of the Agent.

**6.08**    *Compliance with Laws*.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09**    *Books and Records; Accountants*.  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

**6.10**    *Inspection Rights*.  Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

**6.11**    *Use of Proceeds*.  Use the proceeds of the Loans (a) to finance the acquisition of working capital assets of the Loan Parties, including the purchase of Inventory and Equipment, in each case in the ordinary course of business, (b) to finance capital expenditures of the Loan Parties, and (c) for general corporate purposes of the Loan Parties, in each case in compliance with the Budget and the Orders, subject to the last sentence of <u>Section 2.12(c)</u> and to the extent not prohibited under applicable Law and the Loan Documents.

**6.12**    *Chief Restructuring Officer.*

(a)    Debtor shall retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Agent and at the sole cost and expense of Debtor, Benjamin Waisbren, or such other Person acceptable to Agent as its chief restructuring officer (the "CRO"). The CRO shall assume in all respects the management of the businesses and properties of Debtor and shall, among other things, assist Debtor in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in the Loan Documents. The CRO shall report directly to the Board of Directors of Debtor.

(b)    Debtor hereby irrevocably authorizes and directs the CRO to consult with Agent and to share with Agent and Lenders all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the CRO relating to the Collateral, or the financial condition or operations of the businesses of Debtor. Debtor agrees to provide the CRO with complete access to and supervision over all of the books and records of Debtor, all of the premises of Debtor and to all management and employees of Debtor as and when deemed necessary by the CRO.

(c)     Debtor shall not amend, modify or terminate the retention agreement with the CRO without the prior written consent of Agent. Debtor acknowledges and agrees that Debtor shall cause the CRO to keep Agent and Lenders (i) fully informed of the progress of the business and operations of Debtor and respond fully to any inquiries of Agent and Lenders regarding the business and operations of Debtor and (ii) communicate and fully cooperate with Agent and Lenders and share all information with Agent and Lenders regarding Debtor, and the business and operations of Debtor.

(d)     If the CRO resigns, Debtor shall immediately notify Agent in writing and provide Agent with a copy of any notice of resignation immediately upon the sending of such notice by such CRO. Any replacement or successor CRO shall be acceptable to Agent and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Agent within five (5) Business Days immediately following the notice of resignation of the resigning CRO, or within such longer period of time as the Agent may agree in writing. Failure to comply with the terms and conditions of this Section 6.12 shall constitute an Event of Default.

**6.13**   *Milestones*.  Achieve each of the following milestones (as the same may be extended from time to time with the consent of the Agent; the "Milestones"):

(a)     On or before April 22, 2019, the Bankruptcy Court shall have entered an interim order, in form and substance satisfactory to Agent, approving the Bidding Procedures Motion (the "Bid Procedures Order").

(b)     On or before May 6, 2019, the Debtor shall have received a letter of intent, in form and substance acceptable to Agent, with a "stalking horse" bidder, acceptable to Agent in its sole discretion, for the purchase of all or substantially all of the Debtor's assets (the "Sale").

(c)     On or before May 13, 2019, (i) the Debtor shall have entered into an asset purchase agreement in form and substance acceptable to Agent with a "stalking horse" bidder, acceptable to Agent in its sole discretion (the "Stalking Horse Bidder"), committing to purchase all or substantially all of the Debtor's assets (the "Stalking Horse APA") and (ii) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Agent, approving the Stalking Horse APA.

(d)     On or before May 23, 2019, the Debtor shall file with the Bankruptcy Court a notice of entry into the Stalking Horse APA, together with a copy of such Stalking Horse APA.

(e)     On or before June 19, 2019, Debtor shall conduct an auction (the "Auction"), in accordance with the Bid Procedures Order, of all or substantially all of the Debtor's assets, and in connection with such Auction (i) in the event that the successful bidder is not the Stalking Horse Bidder, such successful bidder and such successful bid, shall each be acceptable to Agent and (ii) there shall be at least one (1) qualified bidder (other than the Stalking Horse Bidder) which is acceptable to Agent and each qualified bidder shall be acceptable to Agent.

(f)     On or before June 24, 2019, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Agent, approving the Sale to the successful Auction bidder and which provides that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from the closing of such Sale(s), subject to approval by Agent shall be remitted to Agent for application against, and in permanent reduction of, the Obligations.

(g)     On or before June 25, 2019, Debtor shall have (i) consummated the Sale(s); and (ii) distributed proceeds of the Sale(s) to Agent in a minimum cash amount not less than the amount required to satisfy the Obligations for application against and permanent reduction of the Obligations.

(h)    Debtor confirms, acknowledges and agrees that notwithstanding anything to the contrary contained in this Agreement, any failure to comply with the requirements set forth in this Section 6.13 shall constitute an additional immediate Event of Default.

6.14    *Information Regarding the Collateral.*  Furnish to the Agent at least fifteen (15) days (or such shorter period as the Agent may agree) prior written notice of any change in: (i) any Loan Party's name; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility, but excluding in-transit Collateral); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.

6.15    *Cash Management.*  Borrower shall establish and maintain, at its expense, blocked accounts or lockboxes and related blocked accounts (in either case, "Blocked Accounts"), as Agent may specify, with Today's Bank or such other banks as are reasonably acceptable to Agent into which Borrower shall promptly deposit all payments on Receivables and all payments constituting proceeds of Inventory or other Collateral in the identical form in which such payments are made, whether by cash, check or other manner.  Borrower shall deliver, or cause to be delivered to Agent a control agreement, in form and substance satisfactory to the Agent (each, a "Control Agreement"), duly authorized, executed and delivered by the Borrower and each records bank where a Blocked Account is maintained. Within five (5) Business Days after the date of this Agreement (or such larger period as the Agent may agree to in writing in its sole discretion), Borrower shall deliver, or cause to be delivered, a Control Agreement, duly authorized, executed and delivered by the Borrower and Today's Bank.  Without limiting any other rights or remedies of Agent or Lenders, at any time on and after a Cash Dominion Event, Agent may, at its option, instruct the depository banks at which the Blocked Accounts are maintained to transfer by federal funds wire transfer all funds received or deposited into such Blocked Accounts and related deposit accounts to the Agent or as Agent may direct.

6.16    *Environmental Laws.*  Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; and (b) obtain and renew all material environmental permits necessary for its operations and properties.

6.17    *Further Assurances.*  Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the Orders or the validity or priority of any such Lien, all at the expense of the Loan Parties.

6.18    *Compliance with Terms of Material Leases.*  With respect to Material Leases, except as otherwise excused by the Bankruptcy Court, each Loan Party shall (a) make all payments and otherwise perform all material obligations in respect of each such Lease, (b) keep each such Lease in full force and effect, (c) not allow any such Lease to lapse or be terminated prior to its scheduled termination date (as in effect on the Closing Date) or any rights to renew any such Lease to be forfeited or cancelled, (d) notify the Agent of any default by any party with respect to any such Lease and cooperate with the Agent in all respects to cure any such default, and (e) cause each of its Subsidiaries to do the foregoing.

6.19    *Material Contracts.*  Except as otherwise excused by the Bankruptcy Court, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, unless the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.20**    *First Day Orders*.  Cause all proposed "first day" orders submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), or any Commitment shall exist no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01**    *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income other than, as to all of the above, Permitted Encumbrances, and in the case of the assignment or transfer of accounts or other rights to receive payment, except for Permitted Dispositions.

**7.02**    *Investments*.  Make any Investments, except Permitted Investments, or (except with the prior consent of the Agent) form or acquire any Subsidiaries.

**7.03**    *Indebtedness; Disqualified Stock*.  (a)  Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue Disqualified Stock.

**7.04**    *Fundamental Changes*.  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing).

**7.05**    *Dispositions*.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06**    *Restricted Payments*.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that any Subsidiary may make Restricted Payments to the Borrower.

**7.07**    *Prepayments of Indebtedness and Payments of Certain Indebtedness*.  Except in respect of the Obligations as provided for herein, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in respect of any violation of any subordination terms of, any Indebtedness of any Loan Party except as contemplated by the Orders.

**7.08**    *Change in Nature of Business*.  In the case of each of the Loan Parties, engage in any material line of business substantially different from the business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business reasonably related, complementary, ancillary or incidental thereto.

**7.09**    *Transactions with Affiliates*.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties as would be obtainable by

43

the Loan Parties at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**7.10**    *Burdensome Agreements*.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (f)(i) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; provided that the foregoing clauses (a) and (b) shall not apply to (i) restrictions and conditions imposed by law or by any Prepetition Note Purchase Documents (as in effect on the date hereof), (ii) customary provisions included in licenses, contracts, leases, agreements and other instruments restricting assignment and/or encumbrance, (iii) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or other assets pending such sale, provided such restrictions and conditions apply only to the Subsidiary or other assets that is to be sold (or to earnest money deposits in connection with such sale) and such sale is permitted hereunder, (iv) in the case of clause (a) above, restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (v) [reserved], (vi) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted hereunder, (vii) customary provisions restricting subletting, assignment or transfer of any Lease governing a leasehold interest of the Parent or any Subsidiary, (viii) restrictions arising in connection with cash or other deposits permitted hereunder and limited to such cash or deposit, and (ix) restrictions in documents governing any Permitted Indebtedness existing on the date hereof, and (x) any amendments, modifications, restatements or renewals of the agreements, contracts or instruments referred to in clauses (i) through (ix) above, provided that such amendments, modifications, restatements, or renewals, taken as a whole, are not materially more restrictive with respect to such encumbrances or restrictions than those contained in such predecessor agreements, contracts or instruments.

**7.11**    *Use of Proceeds*.  Use the proceeds of any Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

**7.12**    *Amendment of Material Documents*.

      (a)    Amend, modify or waive any of a Loan Party's rights under (i) its Organization Documents in a manner materially adverse to the Credit Parties, or (ii) any Material Contract or Material Indebtedness, in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

      (b)    Amend, modify or change in any manner any "first day order" in any material respect without the prior consent of the Agent or take any other action that would materially impair the value of the interest or rights of any Loan Party thereunder or that would materially impair the ability of the Lenders to be repaid hereunder.

**7.13**    *Fiscal Year.*  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14**    *Deposit Accounts*.  Except as expressly permitted under <u>Article XI</u>, open or maintain any bank accounts, securities accounts or commodities accounts.

**7.15**    *Financial Covenants*.

(a)    <u>Budget Variance</u>.  As of Wednesday of any week, commencing on the Wednesday following the first full calendar week after the Petition Date, permit (i) the actual amount of cash disbursements of the Debtor for the most recent Measurement Period then ended to exceed the amount of cash disbursements specified in the applicable Budget for such Measurement Period by more than 10% or (ii) the actual amount of cash receipts of the Debtor for the most recent Measurement Period then ended to be less than 90% of the cash receipts specified in the applicable Budget for such Measurement Period.

(b)    [Reserved].

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01**    *Events of Default*.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan, any interest on any Loan, or any fee due hereunder, or (ii) any other amount payable hereunder or under any other Loan Document within three (3) days of its due date; or

(b)    <u>Specific Covenants</u>.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section</u> <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.14</u>, <u>6.15</u>, <u>6.18</u>, <u>6.23</u> or <u>6.24</u>, <u>Article VII</u> or <u>Article XI</u>; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after the earlier of (i) the date such Loan Party obtains knowledge of a breach of any such covenant or agreement or (ii) the Borrower's receipt of notice from the Agent of any such breach; or

(d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Injunction, etc</u>.  Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or a trustee, receiver or custodian is appointed for Debtor, or any of its properties; or

(f)    <u>Challenges</u>. Any Loan Party shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Obligations; or

45

(g)      Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $50,000 and such judgments or orders shall continue unsatisfied or unstayed for a period of forty-five (45) days (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of forty-five (45) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(h)      ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $50,000 or which has or would reasonably be expected to result in a Material Adverse Effect when taken together with all other such ERISA Events, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan, or any installment in connection with an unfunded Pension Plan, in either case, in an aggregate amount in excess of $50,000 or which would reasonably likely result in a Material Adverse Effect; or

(i)      Invalidity of Loan Documents.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document (other than as a result of the discharge of such Loan Party in accordance with the terms of the applicable Loan Document), or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral (other than as a result of Agent's negligence with respect to failure to maintain the filing of a financing statement or loss of possessory Collateral), with the priority required by the applicable Security Document; or

(j)      Events under Orders.  There occurs any condition or event which permits Agent and Lenders to exercise any of the remedies set forth in either Order, including, without limitation, the failure to pay all administrative expense claims then due in accordance with the Budget (except as set forth in the Orders or the Loan Documents) or any other "Event of Default" (as defined in Order); or

(k)      Loss of Collateral.  There occurs any uninsured loss (in excess of any applicable insurance deductible) to Collateral with an aggregate value in excess of $50,000; or

(l)      Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of the Axel Contract or Axel Loan Documents or fails to observe or perform any other agreement or condition relating to any such Axel Contract or Axel Loan Documents or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit Axel to terminate any such Axel Contract or Axel Loan Documents or to accelerate amounts due thereunder; or

46

(m)     Indictment.  The indictment by Governmental Authority of any Loan Party or any Subsidiary thereof under any criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(n)     Termination of Loan Documents.  The termination or non-renewal of the Loan Documents as provided for in either Order; or

(o)     Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, any such provisions being referred to as the "Intercreditor Provisions", shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness; or (ii) the Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Intercreditor Provisions, (B) that the Intercreditor Provisions exist for the benefit of the Credit Parties, or (C) in the case of Subordinated Indebtedness, that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Intercreditor Provisions; or

(p)     Interim Order.  The Debtor shall fail to obtain entry of the Interim Order authorizing and approving the DIP Term Loan Facility within five (5) business days following the Petition Date; or

(q)     Dismissal or Conversion of Case.  (i) The Debtor shall file any motion seeking (x) dismissal of the Case under Chapter 11 of the Bankruptcy Code or (y) to convert the Case under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 of the Bankruptcy Code, (ii) the Case under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case shall be dismissed either voluntarily or unvoluntarily, (iii) the Case under Chapter 11 of the Bankruptcy Code shall be converted to a case under Chapter 7 of the Bankruptcy Code, or (iv) a trustee shall be appointed in the Case under Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall be appointed in the Case under Chapter 11 of the Bankruptcy Code; or

(r)     Material Adverse Effect.  There shall occur any act, condition or event after the Petition Date that has or could reasonably expect to have a Material Adverse Effect; or

(s)     Competing Claims.  Other than as contemplated by the Loan Documents, entry of an order granting any Lien or claim which is senior to or pari passu with the Lien and claims of the Agent for the benefit of the Lender under the DIP Term Loan Facility (other than the Carve-Out) without the prior written consent of the Agent (or the filing of any motion by the Debtor seeking such relief); or

(t)     No Repayment of Obligations.  The entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a Reorganization Plan that does not require indefeasible repayment in full in cash of the Obligations under DIP Term Loan Facility as of the effective date of such Reorganization Plan; or

(u)     Adequate Protection.  The payment of or granting adequate protection with respect to prepetition Indebtedness (other than as approved by the Agent and the Bankruptcy Court or as otherwise contemplated by the Orders or the Loan Documents); or

(v)     Superpriority Claims.  (i) The failure of Liens or DIP Superpriority Claims granted with respect to the DIP Term Loan Facility to be valid, perfected and enforceable in all respects with the priority described in the applicable Order, or (ii) the disallowance, expungement, extinguishment or impairment of any portion of the DIP Superpriority Claim or (iii) the grant of a Lien on or other

interest in any property of the Debtor, other than a Permitted Encumbrance or a Lien permitted by the Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral; or

(w)     Automatic Stay.  The entry of one or more orders of the Bankruptcy Court lifting the automatic stay with respect to assets of the Debtor, without the prior written consent of the Agent; or

(x)     Invalidity or Violation of Orders.  (i) The Interim Order or Final Order, as applicable, shall cease to be in full force and effect, or shall be amended, modified, stayed or vacated without the written consent of the Agent, or (ii) there shall have occurred a violation of the Interim Order or the Final Order, as applicable, which adversely affects the rights and protections afforded to the Agent and the Lenders; or

(y)     Purchase Agreements.  Any asset purchase agreement or agreements for the sale of Debtor's assets pursuant to the Sale shall cease to be in full force and effect; or

(bb)     Administrative Expense Claims.  The grant of an administrative expense claim in the Case, other than such administrative expense claim permitted by the Orders or this Agreement, which is superior to or ranks in parity with Agent's DIP Superpriority Claims (as defined in the Order); or

(cc)     Budget.  The entry by the Bankruptcy Court of an order requiring the payment of an administrative or priority claim in an amount or manner not reflected in the Budget; or

(dd)     Orders.  The failure of Borrower to comply with any Order or any terms therein, or any Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender); or

(ee)     Appointment of Trustee.  The appointment of a trustee pursuant to Sections1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; or

(ff)     Appointment of Examiner.  The appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code; or

(gg)     Plan.  The filing of a plan of reorganization or liquidation by or on behalf of the Borrower, to which Agent has not consented in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; or

(hh)     Plan Confirmation.  The confirmation of any plan of reorganization or liquidation in the Case, to which Agent has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; or

(ii)     Expense Order.  The filing of a motion by the Borrower (or any Affiliate) seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from the Agent or any Lender) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or

(jj)    CRO. (i) The failure of the Borrower to comply with any material provision of its engagement agreement with the CRO; or (ii) the termination of any such agreements for any reason without the prior written consent of the Agent.

**8.02**    *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions: (a) terminate the Commitments, (b) upon written notice to the Borrower (with a copy to counsel for the Creditors' Committee in the Case and the U.S. Trustee (as defined in the Interim Order)) and subject to the termination of the automatic stay under Section 362 of the Bankruptcy Code: (i) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and (ii) to the extent not prohibited by Orders, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

For the purpose of enabling Agent to exercise the rights and remedies hereunder, each Loan Party hereby grants to Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing) without payment of royalty or other compensation to, any Loan Party, to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other Intellectual Property and general intangibles now owned or hereafter acquired by any Loan Party, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

**8.03**    *Application of Funds*.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Agent in the following order (subject to the terms of the last sentence of Section 2.12):

First, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including

49

fees, charges and disbursements of counsel to the respective Lenders and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and fees payable in respect thereof, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Fourth</u> held by them until paid in full;

<u>Fifth</u>, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations), ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Fifth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01**     *Appointment and Authority*.

(a)     Each of the Lenders hereby irrevocably appoints Michaelson to act on its behalf as the administrative and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b)     Each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints Michaelson as Agent and authorizes the Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as "Agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to <u>Section 9.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> and <u>Article X</u> (including <u>Section 10.04(c)</u>), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)     Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents to which it is a party.  Each Lender agrees that any action taken by the Agent or the Required Lenders in accordance with the terms of this Agreement or the other Loan Documents and the exercise by the Agent or the Required Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

50

(d)        The Lenders acknowledge that the Obligations are secured by Liens on the Collateral and that the exercise of certain of the rights and remedies of Agent under the Loan Documents may be subject to the provisions of the Orders.  Each Lender irrevocably (i) authorizes and directs the Agent to take all actions (and execute all documents) required (or deemed advisable) by it in accordance with the terms of the applicable Order and without any further consent, authorization or other action by such Lender, (ii) agrees that such Lender will be bound by the provisions of the applicable Order and will take no actions contrary to the provisions the applicable Order, (iii) agrees that no Lender shall have any right of action whatsoever against the Agent as a result of any action taken by Agent pursuant to this Section or in accordance with the terms of the applicable Order and (iv) acknowledges (or is deemed to acknowledge) that a copy of the applicable Order has been delivered, or made available, to such Lender. Each Lender hereby further irrevocably authorizes and directs the Agent to enter into such amendments, supplements or other modifications to the applicable Order as are approved by Agent and the Required Lenders, provided, that Agent may execute and deliver such amendments, supplements and modifications thereto as are contemplated by the applicable Order in connection with any extension, renewal, refinancing or replacement of this Agreement or any refinancing of the Obligations, in each case, on behalf of such Lender and without any further consent, authorization or other action by any Lender.  The Agent shall have the benefit of the provisions of this Article IX with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the applicable Order to the full extent thereof.

9.02        *Rights as a Lender*.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

9.03        *Exculpatory Provisions*.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)        shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections

10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04**    *Reliance by Agent*.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice (including telephonic Committed Loan Notices), request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05**    *Delegation of Duties*.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

**9.06**    *Resignation of Agent*.  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the approval of the Borrower (which shall not be required if an Event of Default has occurred and is continuing), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.  If no

such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders (subject to the approval of the Borrower, which approval shall not be required if an Event of Default has occurred and is continuing), appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

9.07    *Non-Reliance on Agent and Other Lenders*.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  The Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

9.08    *Collateral and Guaranty Matters*.  The Credit Parties irrevocably authorize the Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Agent under any Loan Document (a) upon payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the termination of all Commitments, (b) that is Disposed of or to be Disposed of to a Person other than a Loan Party as part of or in connection with any Disposition permitted hereunder or under any other Loan Document, or (c) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release its interest in particular types or items of property pursuant to this Section 9.08.  In each case as specified in this Section 9.08, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents in accordance with the terms of the Loan Documents and this Section 9.08.

**9.09**    *Notice of Transfer*.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in <u>Section 10.06</u>.

**9.10**    *Agency for Perfection*.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession or control.  Should any Lender (other than the Agent) obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.11**    *Indemnification of Agent*.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and their Related Parties in connection therewith; <u>provided</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence, bad faith or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.12**    *Relation among Lenders*.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

**ARTICLE X**
**MISCELLANEOUS**

**10.01**    *Amendments, Etc*.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Agent at the direction of the Required Lenders), and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

        (a)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 2.01</u>) without the written Consent of such Lender;

        (b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for any scheduled payment (including the Maturity Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment;

        (c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; <u>provided</u>, <u>however</u>, that only the Consent of the Required Lenders shall be necessary to

54

amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)        as to any Lender, change Section 2.12(c), Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby or the priority of such payments set forth therein without the written Consent of each Lender;

(e)        change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)        except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party or permit such Loan Party to assign its rights under the Loan Documents without the written Consent of each Lender;

(g)        except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents or release all or substantially all of the Guaranties without the written Consent of each Lender;

(h)        increase the Aggregate Commitments without the written Consent of each Lender; and

(i)        except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.

**10.02**   *Notices; Effectiveness; Electronic Communications.*

(a)        Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)        if to the Loan Parties, or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)        if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered

through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      Change of Address, Etc.  Each of the Loan Parties, the Agent, may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(c)      Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03**   *No Waiver; Cumulative Remedies*.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04**   *Expenses; Indemnity; Damage Waiver*.

(a)      Costs and Expenses.  The Borrower shall pay all Credit Party Expenses.

(b)      Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a

56

Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    Reimbursement by Lenders. Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are several and not joint. The failure of any Lender to make any payment under this subsection (c) shall not relieve any other Lender of its obligation to do so, and no Lender shall be responsible for the failure of any other Lender to make its required payment hereunder.

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments. All amounts due under this Section shall be payable on demand therefor.

(f)    Survival. The agreements in this Section shall survive the resignation of the Agent, the assignment of any portion of any Loan by any Lender, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations.

**10.05**    *Payments Set Aside*. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party

in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06**  *Successors and Assigns.*

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Loan and/or unused Commitment at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date of the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $100,000 unless each of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and shall be deemed given if the Borrower has not responded to a request for such consent within

seven (7) Business Days); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans and/or the Commitments assigned;

(iii)     Required Consents and Other Conditions.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section, and in addition:

(A)     [reserved];

(B)     the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Loans or Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     no assignment may be made to a Loan Party or an Affiliate of a Loan Party.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender and a Note or replacement Note to the assignor Lender (in the event of a replacement Note, the assignor Lender shall cancel and return to Borrower the superseded Note). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the

Loan Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c) or (f) of the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements and limitations of such Sections to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender granting a participation shall, as a non-fiduciary agent of Borrower, maintain a register ("Participant Register") with respect to the ownership and transfer of each participation containing the information set forth in the Register described in Section 10.06(c); provided that, no Lender shall have any obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other rights or obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other right or obligation is in registered form under Treasury Regulation Sections 5f.103-1(c) and 1.871-14(c). No transfer of a participation shall be effective unless recorded in such Participation Register. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the right to receive a greater payment results from a Change in Law after the participant becomes a Participant.

(f)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.07**  *Pre-Petition Obligations*.  (a)  The Borrower hereby acknowledges, confirms and agrees that, as of April 8, 2019, Borrower is indebted to the Prepetition Note Purchasers in respect of all Prepetition Note Purchase Obligations in the aggregate principal amount of not less than $10,782,234, consisting of principal of $10,143,577, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) and other charges now or hereafter owed by Borrower to the Prepetition Note Purchasers, all of which are unconditionally owing by Borrower to the Prepetition Note Purchasers, without offset, defense or counterclaim of any kind, nature and description whatsoever.

(b)    The Borrower hereby acknowledges, confirms and agrees that Michaelson and the Prepetition Collateral Agent have and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Prepetition Collateral heretofore granted to Michaelson and the Prepetition Collateral Agent pursuant to the Prepetition Note Purchase Documents as in effect immediately prior to the Petition Date to secure all of the Prepetition Note Purchase Obligation, subject only to Liens expressly permitted by the Prepetition Note Purchase Documents or the Orders.

(c)    The Borrower hereby acknowledges, confirms and agrees that: (i) each of the Prepetition Note Purchase Documents was duly executed and delivered to Michaelson by the Borrower and each is in full force and effect as of the date hereof, (ii) the agreements and obligations of the Borrower contained in the Prepetition Note Purchase Documents constitute the legal, valid and binding obligations of the Borrower enforceable against it in accordance with the terms thereof, and the Borrower has no valid defense, offset or counterclaim to the enforcement of such obligations, and (iii) the Prepetition Note Purchase Documents are and shall be entitled to all of the rights, remedies and benefits provided for Prepetition Note Purchase Documents in the and the Orders.

**10.08**  *Right of Setoff*.  Subject to the Orders, if an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, or its respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09**   *Interest Rate Limitation*.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10**   *Counterparts; Integration; Effectiveness*.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11**   *Survival*.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Loans, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder (other than contingent indemnity obligations for which claims have not been made) shall remain unpaid or unsatisfied.  Further, the provisions of Section 3.01, and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under Section 10.04.

**10.12**   *Severability*.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13**   *Reserved*.

**10.14**   *Governing Law; Jurisdiction; Etc.*

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM )JURISDICTION, SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15** *Waiver of Jury Trial.* EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16** *No Advisory or Fiduciary Responsibility.* In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17** *USA PATRIOT Act Notice.* Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the PATRIOT Act it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.

**10.18**    *Foreign Asset Control Regulations.*  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, to the best knowledge of each Loan Party, none of the Loan Parties or their respective Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19**    *Foreign Corrupt Practices Act.*  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended

**10.20**    *Time of the Essence.*  Time is of the essence with respect to all provisions of the Loan Documents.

**10.21**    *Additional Waivers.*

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the

Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations.  The Agent and the other Credit Parties may, at their election, and subject to the Orders, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)    Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations.  In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

**10.22**    *No Strict Construction*.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.23**    *Attachments*.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.24**    *Orders Govern*.  Notwithstanding anything herein to the contrary, the exercise of rights and remedies of the Agent and Lenders hereunder and under any other Loan Document is subject to the provisions of the Orders.  In the event of any conflict between the terms of the Orders and the terms of this Agreement or any other Loan Document, the terms of the Orders shall govern and control.

## ARTICLE XI
## GRANT AND PERFECTION OF SECURITY INTEREST

**11.01**    *Grant of Security Interest*.  To secure payment and performance of all Obligations, each Loan Party hereby grants to Agent, for itself and the benefit of Lenders, a continuing security interest in, a lien upon, and a right of set off against, and hereby collaterally assigns to Agent, for itself and the benefit of Lenders, as security, all real and personal property and interests in real and personal property, of each Loan Party's estate, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by

Collateral Agent, Agent or any Lender, collectively, the "Collateral"), including all of each Loan Party's right, title and interest in and to the following:

(a)     all Accounts;

(b)     all general intangibles, including, without limitation, all Intellectual Property;

(c)     all goods, including, without limitation, Inventory and Equipment;

(d)     all Real Estate and fixtures (as such term is defined in the UCC);

(e)     all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(f)     all instruments, including, without limitation, all promissory notes;

(g)     all documents and all credit card sales drafts, credit card sales slips or charge slips or receipts and other forms of store receipts;

(h)     all deposit accounts;

(i)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(j)     all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(k)     all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of each Borrower or Guarantor now or hereafter held or received by or in transit to Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of each Borrower or Guarantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(l)     all commercial tort claims, including, without limitation, those identified in Schedule 11.02(g);

(m)     to the extent not otherwise described above, all Receivables;

(n)     all Records;

(o)     all of the Prepetition Note Purchase Collateral;

(p)     the Specified D&O Policy;

67

(q)      all claims, rights, interests, assets and properties (recovered by or on behalf of each Loan Party or any trustee of such Loan Party (whether in the Case or any subsequent case to which the Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code; and

(r)      all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

**11.02**   *Perfection of Security Interests.*

(a)      Each Loan Party irrevocably and unconditionally authorizes Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Agent or its designee as the secured party and such Loan Party as debtor, as Agent may require, and including any other information with respect to such Loan Party or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as Agent may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof.  Each Loan Party hereby ratifies and approves all financing statements naming Agent or its designee as secured party and such Loan Party, as the case may be, as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Agent prior to the date hereof and ratifies and confirms the authorization of Agent to file such financing statements (and amendments, if any).  Each Loan Party hereby authorizes Agent to adopt on behalf of such Loan Party any symbol required for authenticating any electronic filing.  In the event that the description of the collateral in any financing statement naming Agent or its designee as the secured party and any Loan Party as debtor includes assets and properties of such Loan Party that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by such Loan Party to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral.  In no event shall any Loan Party at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming Agent or its designee as secured party and such Loan Party as debtor, provided, that, upon the sale or other disposition of specific items of Collateral to a Person other than a Loan Party in compliance with Section 7.05 hereof, Agent shall, upon the written request of Borrower, file or cause to be filed, at the expense of Borrower, UCC partial releases solely with respect to such Collateral.

(b)      In the event that any Loan Party shall be entitled to or shall receive any chattel paper or instrument after the date hereof, each Loan Party shall, upon the request of the Agent, promptly notify Agent thereof in writing.  Promptly upon the receipt thereof by or on behalf of any Loan Party (including by any agent or representative), such Loan Party shall deliver, or cause to be delivered to Agent, all tangible chattel paper and instruments that such Loan Party has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify, in each case except as Agent may otherwise agree.  At Agent's option, each Loan Party shall, or Agent may at any time on behalf of any Loan Party, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner acceptable to Agent with the following legend referring to chattel paper or instruments as applicable: "This [chattel paper][instrument] is subject to the security interest of Michaelson Capital Special Finance Fund II, L.P., as Agent, and any sale, transfer, assignment or encumbrance of this [chattel paper][instrument] violates the rights of such secured party."

(c)        In the event that any Loan Party shall at any time hold or acquire an interest in any electronic chattel paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), such Loan Party shall upon the request of the Agent promptly notify Agent thereof in writing.  Promptly upon Agent's request, such Loan Party shall take, or cause to be taken, such actions as Agent may request to give Agent control of such electronic chattel paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d)        Each Loan Party does not have any deposit accounts as of the date hereof, except as set forth in Schedule 11.02(d).  Loan Parties shall not, directly or indirectly, after the date hereof open, establish or maintain any deposit account unless each of the following conditions is satisfied:  (i) Agent shall have received not less than five (5) Business Days prior written notice of the intention of any Loan Party to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Agent the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such Loan Party is dealing and the purpose of the account, and (ii) on or before the opening of such deposit account, upon the request of the Agent, such Loan Party shall as Agent may specify either (A) deliver to Agent a control agreement, in form and substance satisfactory to Agent, with respect to such deposit account duly authorized, executed and delivered by such Loan Party and the bank at which such deposit account is opened and maintained or (B) arrange for Agent to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to Agent.

(e)        No Loan Party owns or holds, directly or indirectly, beneficially or as record owner or both, any investment property, as of the date hereof, or has any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the date hereof, in each case except as set forth in Schedule 11.02(e).

(i)        In the event that any Loan Party shall be entitled to or shall at any time after the date hereof hold or acquire any certificated securities, such Loan Party shall promptly endorse, assign and deliver the same to Agent, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify.  If any securities, now or hereafter acquired by any Loan Party are uncertificated and are issued to such Loan Party or its nominee directly by the issuer thereof, such Loan Party shall immediately notify Agent thereof and shall as Agent may specify, either (A) cause the issuer to agree to comply with instructions from Agent as to such securities, without further consent of any Loan Party or such nominee, or (B) arrange for Agent to become the registered owner of the securities.

(ii)        Loan Parties shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a deposit account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied: (A) Agent shall have received not less than five (5) Business Days prior written notice of the intention of such Loan Party to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Agent the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such Loan Party is dealing and the purpose of the account, and (B) on or before the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, upon

69

the request of the Agent such Loan Party shall as Agent may specify either (1) execute and deliver, and cause to be executed and delivered to Agent, a control agreement, in for and substance to the Agent, with respect thereto duly authorized, executed and delivered by such Loan Party and such securities intermediary or commodity intermediary or (2) arrange for Agent to become the entitlement holder with respect to such investment property on terms and conditions acceptable to Agent.

(f)    Loan Parties are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the date hereof, except as set forth in Schedule 11.02(f).  In the event that any Loan Party shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, such Loan Party shall promptly notify Agent thereof in writing.  Such Loan Party shall upon the request of the Agent immediately, as Agent may specify, either (i) deliver, or cause to be delivered to Agent, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance satisfactory to Agent in good faith, consenting to the assignment of the proceeds of the letter of credit to Agent by such Loan Party and agreeing to make all payments thereon directly to Agent or as Agent may otherwise direct or (ii) cause Agent to become, at Borrower's expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be).

(g)    Loan Parties do not have any commercial tort claims as of the date hereof, except as set forth in Schedule 11.02(g).  In the event that any Loan Party shall at any time after the date hereof have any commercial tort claims, such Loan Party shall promptly notify Agent thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such Loan Party to Agent of a security interest in such commercial tort claim (and the proceeds thereof).  In the event that such notice does not include such grant of a security interest, the sending thereof by such Loan Party to Agent shall be deemed to constitute such grant to Agent.  Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein.  Without limiting the authorization of Agent provided in Section 11.02(a) hereof or otherwise arising by the execution by such Loan Party of this Agreement or any of the other Loan Documents, Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Agent or its designee as secured party and such Loan Party as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral.  In addition, each Loan Party shall promptly upon Agent's request, execute and deliver, or cause to be executed and delivered, to Agent such other agreements, documents and instruments as Agent may require in connection with such commercial tort claim.

(h)    Loan Parties do not have any goods, documents of title or other Collateral in the custody, control or possession of a third party as of the date hereof, except as set forth in Schedule 11.02(h) and except for goods located in the United States of America in transit to a location of a Loan Party permitted herein in the ordinary course of business of such Loan Party in the possession of the carrier transporting such goods.  In the event that any goods, documents of title or other Collateral are at any time after the date hereof in the custody, control or possession of any other person, Loan Parties shall promptly notify Agent thereof in writing.  Promptly upon Agent's request, Loan Parties shall deliver to Agent a collateral access agreement, in form and substance satisfactory to the Agent, duly authorized, executed and delivered by such person and the Loan Party that is the owner of such Collateral.

(i)    Loan Parties shall take any other actions reasonably requested by Agent from time to time to cause the attachment, perfection and first priority (except to the extent otherwise provided in the Orders) of, and the ability of Agent to enforce, the security interest of Agent in any and all of the

Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (ii) causing Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States of America as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iv) obtaining the agreement of the applicable insurer with respect to the pledge or collateral assignment of any interest in insurance included in the Collateral, (v) obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and (vi) taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.

      **11.03**    *Special Provisions Regarding Collateral*.  Notwithstanding anything to the contrary contained in this Article XI, the types or items of Collateral described in <u>Section 11.01</u> hereof shall not include (a) on any leasehold interest in Real Estate that was not previously encumbered by security interests or liens in favor of Agent, for itself and the benefit of Lenders, as of the Petition Date, but shall instead include all proceeds of such leasehold interests subject to any valid senior encumbrances; or (b) any executory contract or agreement to the extent the contract or agreement does not permit the grant of a lien thereon and was not previously encumbered by security interest or liens in favor of Agent, for itself and the benefit of Lenders; provided, that, the foregoing exclusion shall in no way be construed (i) to apply if any such prohibition is unenforceable under the UCC or other applicable law or (ii) so as to limit, impair or otherwise affect Agent's unconditional continuing security interests in and liens upon any rights or interests of any Loan Party in or to monies due or to become due under, or any proceeds of, any such lease, contract, license or license agreement (including any Receivables).

[Signature Pages Follow]

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**

**NANOMECH, INC.**, as Borrower

By: _____

Name: _____

Title: _____

5651740.11

MICHAELSON CAPITAL SPECIAL FINANCE FUND
II, L.P., as Agent

By: _____
Name:
Its Authorized Signatory

MICHAELSON CAPITAL SPECIAL FINANCE FUND
II, L.P., as Lender

By: _____
Name:
Its Authorized Signatory

5651740.11

**Schedule 2.01**

**Commitments; Applicable Percentages**

| Lender | Initial Term Loan Commitment | Delayed Draw Term Loan Commitment | Total Commitment | Applicable Percentage |
|---|---|---|---|---|
| Michaelson Capital Special Finance Fund II, L.P. | $250,000 | $600,000 | $850,000 | 100% |
| Total | $250,000 | $600,000 | $850,000 | 100% |

**Schedule 10.02**

**Agent's Office; Certain Addresses for Notices**

Loan Parties Addresses

**NANOMECH, INC.**
2447 Technology Way
Springdale, Arkansas 72764
Telecopier: (479) 756-9919
Attn: Chief Restructuring Officer

With a copy to:

GELLERT SCALI BUSENKELL & BROWN, LLC
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Telecopier: (302) 425-5814
Attn: Michael Busenkell, Esq.

Agent's Address

**MICHAELSON CAPITAL SPECIAL FINANCE FUND II, L.P.**
c/o Michaelson Capital Partners, LLC
509 Madison Avenue, Suite 2210
New York, New York 10022
Telecopier: (212) 433-1301
Attn:    Vincent S. Capone, Esq., President and General Counsel

With a copy to:

**OTTERBOURG, P.C.**
230 Park Avenue
New York, New York 10169
Telecopier: (212) 682-6104
Attn:    Michael Barocas, Esq.